(No. 65010.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. JOSHUA FIERER, Appellee.

*Opinion filed September 22, 1988.*

Neil F. Hartigan, Attorney General, of Springfield, and Erik I. Blanc, State's Attorney, of Pekin (Shawn W. Denney, Solicitor General, Terence M. Madsen and David E. Bindi, Assistant Attorneys General, of Chicago, and John X. Breslin, Gerald P. Ursini and Kenneth R. Boyle, of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Nathan Lewin and Mary L. Lyons, of Miller, Cassidy, Larroca & Lewin, of Washington, D.C., for appellee.

JUSTICE RYAN delivered the opinion of the court:

The defendant, Dr. Joshua Fierer, was charged in a five-count information with the murder of his wife. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1.) Following a jury trial in the circuit court of Tazewell County, the defendant was found guilty but mentally ill (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j)), and was sentenced to a 30-year term of imprisonment. The appellate court reversed the defendant's conviction on a number of grounds and remanded for a new trial. (151 Ill. App. 3d 649.) We

granted the State's petition for leave to appeal (107 Ill. 2d R. 315).

The defendant and his wife, Mary, were married in 1959. They lived in Morton, Illinois, with their four children. From all accounts, the marriage was a happy one until Mary's mother died in February 1981. Thereafter, Mary's behavior began to change dramatically. She sought counseling from the rabbi of the temple she and the defendant attended. This led to a sexual liaison with the rabbi that began in October 1981 and continued until June 1982. The defendant learned of the affair from the rabbi at that time, and Mary confessed it to him in late 1982 or early 1983.

During this time period, Mary was employed by Exclusive Home Products, a company engaged in the sale of household goods. Many of her meetings with the rabbi occurred when she was ostensibly on business trips related to her employment. It eventually came to light that she had never sold any products, but had falsified purchase orders so it would appear that she had. The defendant eventually paid a $2,000 obligation to the company for the fraudulent sales. Also during this period, Mary was secretly renting a house in Peoria. She also converted to her own use checks that were to be deposited in their children's trust accounts, and ran up uncharacteristically large bills for clothing and personal items. A $3,000 judgment was also entered against her for damage done to the Peoria house.

In June 1981, the Fierers began seeing a marriage counselor. These visits continued until March of 1983, when Mary refused to participate further. In June of that year, she was hospitalized for an overdose of drugs and alcohol. A second similar episode occurred within 10 days of her release from the hospital.

The couple ultimately agreed to a divorce, and the defendant filed a petition in January 1984. The proceed-

ings were initially amicable, but Mary later took a more hostile position, initiating an action to bar the defendant from the family home. In May of that year she moved out of the house, taking the youngest child with her. The next youngest joined her later, and the two elder children elected to remain with their father. Mary interfered with visitation with the younger children until she was enjoined from doing so in September 1984. The defendant also came to learn that despite Mary's statements that the children in her custody were continuing to be reared in the Jewish faith, she was actually taking them to a fundamentalist Christian church.

Against this backdrop, we turn to the events of December 6, 1984. The Fierers had agreed to meet that morning at the family home to divide their property. John Brady, the children's guardian *ad litem*, was present at the home, as well as two workers from a moving company. The moving process proceeded harmoniously until about 10:30 a.m., when Mary left, stating that she was returning to her home to obtain some boxes. She returned 20 to 45 minutes later. Although she had removed her coat earlier, this time Mary declined the defendant's offer to hang it up.

Shortly after Mary returned, Brady went to make a call on the kitchen telephone. He then heard a "commotion" from one of the bedrooms, followed by a woman's voice screaming for help. When he went to the bedroom, he saw the defendant on top of Mary in the doorway of a closet. The defendant's arms were moving rapidly and there was blood on the wall of the closet. Brady, who is 6 feet 7 inches tall, attempted to pull the defendant away, but was unable to do so. He then took a record-carrying case and hit the defendant in the head with some force, but even this blow elicited no reaction. Brady ran from the house seeking help, and the movers went into the bedroom. One attempted to pull the

defendant by the belt and shoulders, but was unable to move him. The other mover found a baseball bat and used it to strike the defendant on the collarbone. The blow had little effect.

By the time the first police officers arrived, the defendant was lying on the floor on top of his wife's body. He did not respond to verbal orders and had to be carried to the hallway. When medical personnel arrived, the defendant was placed in an ambulance. The technicians applied various forms of painful stimuli, attempting to elicit a reaction from the defendant, but he did not respond. One of the technicians described the defendant as "disoriented," and testified that his eyes did not react normally to light.

The defendant testified that he and his wife had gone into the bedroom to sort items of property. He went into the kitchen for a garbage bag, and when he returned he knelt down next to his wife, who was kneeling in the closet. The next thing he noticed was a knife coming at him. The last thing he remembered was grabbing the knife by the blade and trying to wrestle it from his wife. The defendant had knife wounds on his hands about which testimony differed. An expert for the defense described the wounds as defensive, while the State's witness testified that they were more likely to have been caused by slippage of the defendant's hand from the handle onto the blade of the knife. Mary suffered 27 stab wounds and died from the resulting loss of blood.

The defendant's defense was based upon a combination of self-defense and insanity. His basic theory was that Mary had instigated the fatal struggle by attacking him with a knife, and that his violent response was the result of a sudden impulse that he was unable to control. Two psychiatrists testified for the defense that the defendant experienced an "isolated explosive disorder," which, as the name suggests, involves sudden, impulsive,

violent conduct which is alien to one's normal behavior. For the State, an expert testified that the defendant suffered from a "chronic depressive disorder," which would not be considered a mental disease or defect within the meaning of insanity. After hearing all the evidence, the jury returned a verdict of guilty but mentally ill of the offense of murder. As noted, that conviction was overturned by the appellate court, and we granted the State's petition for leave to appeal.

The defendant's broadest claim, one which was rejected by the appellate court, is that the guilty but mentally ill (GBMI) verdict, on its face, is an unconstitutional denial of due process, because it interjects irrelevant, misleading elements into the determination of guilt or innocence. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) We find it unnecessary to resolve that question, however. Because we agree with the appellate court that errors occurred in the presentation of and instruction on the GBMI and insanity verdicts, we need not reach the constitutional issue in order to conclude that the defendant must be granted a new trial.

The first such error involved jury instructions on the burden of proof for the GBMI and insanity verdicts. In order to adequately address this issue, a brief overview of the Illinois GBMI and insanity statutes is in order.

The statute authorizing the GBMI special verdict was enacted in 1981. (Pub. Act 82—553, eff. Sept. 17, 1981; Ill. Rev. Stat. 1981, ch. 38, par. 115—4(j).) With regard to the elements and burden of proof of GBMI, the statute has provided, since its enactment, as follows:

"When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned in-

stead of a general verdict, but that such special verdict requires a unanimous finding by the jury *beyond a reasonable doubt* that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).)

Thus, a verdict of GBMI requires that the State prove three distinct elements—commission of a criminal act, noninsanity and mental illness—beyond a reasonable doubt.

At the time the GBMI statute was enacted, the law in Illinois on the affirmative defense of insanity was that a defendant was presumed sane and bore the burden of introducing some evidence to place sanity in issue. If the defendant presented evidence sufficient to raise a reasonable doubt, the State was then required to prove sanity beyond a reasonable doubt. Ill. Rev. Stat. 1981, ch. 38, pars. 3—2(b), 6—2(a); *People v. Silagy* (1984), 101 Ill. 2d 147, 168.

Under this statutory scheme, the GBMI statute was easily implemented, because the allocation and measure of proof required under both the insanity and GBMI statutes was consistent and complementary. However, effective January 1, 1984, the insanity provisions were modified to require that defendants raising that defense bear the burden of proving their insanity *by a preponderance of the evidence.* (Ill. Rev. Stat. 1983, ch. 38, pars. 3—2(b), 6—2(e).) The GBMI statute was not similarly amended, thus creating an apparent anomaly between the two provisions. Under the new enactment, the defendant now bears the burden of proof of insanity by a preponderance for purposes of a not guilty by reason of insanity verdict, while at the same time the State bears the burden of proof of noninsanity beyond a reasonable doubt for purposes of the GBMI verdict.

This was the dilemma which the trial judge faced in attempting to fashion jury instructions on the issues of insanity and GBMI. He concluded, perhaps understandably, that the two provisions were irreconcilable and that one or the other had to be modified. He therefore instructed the jury that it could return a GBMI verdict if it found:

"First: First beyond a reasonable doubt that the defendant has committed the offense;

Second: By a preponderance of the evidence that the defendant was sane at the time of the commission of that offense;

Third: Beyond a reasonable doubt the defendant was mentally ill at the time of the commission of that offense."

Thus, the GBMI instruction, as given, conflicted with the unambiguous "beyond a reasonable doubt" language of section 115—4(j).

The State first contends that the defendant has waived this issue by acquiescing to use of the modified instruction and by failing to raise this claim in his post-trial motion. It is, of course, true as a general matter that failure to object to a jury instruction constitutes a waiver. (*People v. Roberts* (1979), 75 Ill. 2d 1.) However, "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." 107 Ill. 2d R. 451(c); *People v. Ogunsola* (1981), 87 Ill. 2d 216, 222.

We have stated that fundamental fairness includes, among other things, seeing to it that " '[c]ertain basic instructions, essential to a fair determination of the case by the jury (*e.g., burden of proof*, elements of offense charged), must be given, and the concept of waiver will not be employed to bar reversal if a defendant has been convicted in the absence of these instructions.' " (Emphasis added.) *People v. Roberts* (1979), 75 Ill. 2d 1, 13,

quoting ABA Standards, Trial By Jury §4.6, Commentary, at 116 (1968).

For example, in *People v. Cesarz* (1969), 44 Ill. 2d 180, we declined to apply the waiver rule where no instruction was given advising the jury that the burden was on the State to establish the defendants guilty beyond a reasonable doubt. In our view, if outright failure to give such an instruction is reviewable under Rule 451 (107 Ill. 2d R. 451), an instruction which *misstates* the burden to the defendant's detriment is at least as problematic and equally worthy of review. We therefore decline to treat the issue as waived.

The State next argues that any error in this regard was harmless, because the jury reached a "reliable conclusion" that the defendant was GBMI. We do not agree. In order for an alleged error in instructions to be considered harmless, it must be demonstrated that the result of a trial would not have been different if the proper instruction had been given. (*People v. Moore* (1983), 95 Ill. 2d 404, 410; *People v. Diekelman* (1937), 367 Ill. 372, 387.) Constitutional errors, of course, must be shown to be harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 368 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) Whichever test is applied, it is clear that the standard has not been satisfied in this case.

The modification of the burden of proof from "not insane beyond a reasonable doubt" to "sane by a preponderance of the evidence" had the undeniable effect of making the GBMI verdict easier to attain and more likely to result. If the jury, properly instructed, had been unable to conclude that the defendant was sane beyond a reasonable doubt, it would have faced a more difficult choice between not guilty or guilty. We need not speculate as to the outcome of that decisionmaking process. It is enough to say that the altered GBMI instruction might

have affected that outcome. Therefore, the alleged error cannot be viewed as harmless.

Having disposed of the State's harmless error and waiver arguments, we turn to the merits of the issue. The State argues that the trial court's alteration of the GBMI burden of proof was not erroneous, in light of the burden-shifting amendment to the insanity statutes. In support of this position, the State points out that the GBMI burden of proof provisions coincided with the law on the affirmative defense of insanity as it existed at the time the GBMI statutes were modified in favor of the preponderance standard. Thus, it is argued, the legislature must have intended that the two provisions remain consistent with respect to the burden of proof allocation. Therefore, we are urged to interpret the GBMI statute as requiring proof of sanity by a preponderance as opposed to proof beyond a reasonable doubt.

There is an obvious obstacle in the way of this argument: the clear and unequivocal language of the GBMI statute itself. Whether through inadvertence or by design, the inescapable fact remains that when the General Assembly amended the insanity statute, it did *not* similarly amend the GBMI statute, although it certainly could have done so. Thus, that statute required, and continues to require, that the State prove sanity beyond a reasonable doubt. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) Among the most basic precepts of statutory construction is that statutory terms should be given their plain and ordinary meaning. (*People v. Brown* (1982), 92 Ill. 2d 248.) Similarly, a court cannot read into a statute words which are not within the plain intention of the legislature as determined from the statute itself. (*Bovinette v. City of Mascoutah* (1973), 55 Ill. 2d 129.) The State asks us to "construe" the phrase "beyond a reasonable doubt" as meaning "by a preponderance of the evidence." Such a feat of interpretation is not statu-

tory construction. It is statutory amendment, and statutory amendment is not our role.

The State next argues that alteration of the burden of proof was necessary to avoid constitutional infirmities with the GBMI-insanity scheme. We are compelled to acknowledge that the interrelationship between the insanity and GBMI statutes is rife with potential confusion and other difficulties. Nonetheless, the precise question of whether that interrelationship is so awkward as to be unconstitutional is not properly before us in this case. Thus, we will discuss these concerns, but express no opinion on their ultimate resolution.

Under the current statutes, the State continues to bear the burden of proving sanity beyond a reasonable doubt for purposes of a GBMI verdict. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) At the same time, the defendant bears the burden of establishing insanity by a preponderance of the evidence for purposes of a not guilty by reason of insanity verdict. Under this scheme, a theoretical class of defendants exists who cannot be found insane and thus not guilty by reason of insanity, because they have not carried their preponderance burden, but who also may not be found GBMI because their noninsanity has not been proved by the State beyond a reasonable doubt. In other words, defendants whose sanity is a close question, the very group one would think should be covered by the GBMI verdict, may not be found GBMI because they fall into the gap between "preponderance" and "beyond a reasonable doubt."

This is indeed an anomalous situation for those who fall into this gap. If the defense of insanity is raised and the defendant cannot be found GBMI because the State has not proved that he is not insane beyond a reasonable doubt, under the prior burden of proof arrangement, one would think that a not guilty verdict would be in order. However, because of the amendment to section 3—2(b) of

the Criminal Code, the affirmative defense of insanity is treated differently from other affirmative defenses and differently from the way the defense of insanity itself was previously treated. Under the amendment, the defendant now must do more than present "some evidence" of insanity. (See *People v. Silagy* (1984), 101 Ill. 2d 147, 168.) The defendant now has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. If he fails to do so, even though the State cannot prove him not insane beyond a reasonable doubt and entitled to a GBMI verdict, the only verdict that a jury properly instructed under the statutes can reach is "guilty."

If one of the goals of the GBMI verdict is to identify those in need of psychiatric treatment (see *United States ex rel. Weismiller v. Lane* (7th Cir. 1987), 815 F.2d 1106), the conflicting burdens of proof hinder, rather than advance, that objective.

One other point merits discussion in this context. All other objections aside, the instruction fashioned by the trial court in this case was internally inconsistent. As noted, the court instructed the jury that in order to reach a GBMI verdict, it had to find the defendant sane by a preponderance of the evidence and mentally ill beyond a reasonable doubt. Those two propositions are at odds with each other. The statutory definition of "mentally ill" is:

"[A] substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that *he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of the law.*" (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(d).)

The emphasized passage is the definition of legal insanity. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).) Therefore, to say that the State must prove mental illness beyond a reasonable doubt is to say that it must prove *noninsanity* beyond a reasonable doubt. In other words, the instructions given in this case imposed two different burdens for the same proposition.

We have engaged in this rather lengthy discussion to provide guidance for the trial court upon retrial. For the reasons stated, jury instructions on the issues of GBMI and insanity must reflect the burdens of proof contained in their respective statutes. We acknowledge that given the seemingly conflicting nature of the two provisions, the task of fashioning intelligible instructions may be a difficult one. Only experience will show whether juries can understand and apply the instructions called for by the GBMI and insanity statutes. We invite the legislature to carefully review the interplay between these unclear and confusing statutes.

Our conclusion that the jury was erroneously instructed on the GBMI burden of proof is sufficient to decide this appeal. However, because this case must be retried, we will discuss several other issues raised in case they arise again.

The first such issue deals with another jury instruction. At the request of the prosecution and over defense objection, the judge gave the following instruction relating to the issue of insanity:

> "Abnormality manifested only by criminal or otherwise anti-social conduct is not mental disease or mental defect."

This instruction was a modification of the pattern instruction commonly referred to as the "sociopath" instruction. Illinois Pattern Jury Instructions, Criminal,

No. 24—25.01 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 24—25.01); Ill. Rev. Stat. 1983, ch. 38, par. 6—2(b).

However, the instruction, as given, departed from the statute and pattern instruction in an important respect. Both of those sources include the word "repeated" between the words "by" and "criminal"—*i.e.*, "by *repeated* criminal or otherwise anti-social conduct." The defendant first argues that the instruction should not have been given at all. Alternatively, he contends that it was error to drop the word "repeated" from the instruction. We agree with the first contention, and conclude that the sociopath instruction was not warranted by the facts of this case.

The committee note to IPI Criminal 2d No. 24—25.01 states that the paragraph concerning criminal or antisocial conduct should be given "only when the evidence shows *repeated* criminal or other anti-social conduct." (Emphasis added.) (IPI Criminal 2d No. 24—25.01, Committee Note, at 549.) In both the insanity statute itself and the pattern instruction based upon it, the word "repeated" is central to the definition of sociopathic behavior. Based upon our examination of the record, we find that the defendant was clearly not a sociopathic personality. He had a long history of academic and professional achievement, and no record of illegal or antisocial conduct. Thus, the explicit prerequisite for the instruction was absent.

Indeed, the fact that the trial court saw fit to remove the word "repeated" indicates that it would agree with that assessment of the defendant's history. However, rather than reject the instruction because it did not fit the defendant's record, the court *changed* the instruction to make it fit. It is fundamental that statutes are to be construed so that no word, clause or sentence is rendered meaningless or superfluous. (*People v. Lutz* (1978), 73 Ill. 2d 204.) Thus, the trial court erred when it, in ef-

fect, read the word "repeated" out of the statute. On retrial, assuming the same general evidence of the defendant's background, the instruction should not be given.

The appellate court also held that certain photographs of the victim taken in the autopsy room were erroneously admitted. Because this issue is likely to arise on retrial, we will consider it.

The modern standard for admissibility of photographs was articulated in *People v. Foster* (1979), 76 Ill. 2d 365. In that case, we noted that the "strict" standard of *People v. Jackson* (1956), 9 Ill. 2d 484, had eroded to a large extent in favor of a test more deferential to the trial court's discretion. In *Foster*, this court stated that " '[i]t is the rule that where photographs are relevant to establish any fact in issue that they are admissible in spite of the fact that they may be of a gruesome nature.' " (76 Ill. 2d at 377, quoting *People v. Speck* (1968), 41 Ill. 2d 177, 202.) The court went on to state that "[t]he major bulwark against prejudicing the jury is the sound discretion of the trial judge." 76 Ill. 2d at 378.

Under this approach, we find that admission of the photographs was not an abuse of discretion. The photographs in question were taken after the body of the victim had been cleaned of blood, but before any autopsy procedures had begun. As such, they permitted a clear view of the victim's wounds, but did not show autopsy incisions. (See *People v. Lefler* (1967), 38 Ill. 2d 216.) Although there was no dispute over the cause of the victim's death, issues of self-defense and the defendant's mental state were vigorously contested. The number and nature of the victim's wounds were of some relevance to those issues.

The final issue we shall address relates to admission of bottles of potassium cyanide and secobarbital which were found in the defendant's car on December 6, 1984, and of a newspaper clipping found in his bedroom which

dealt with a divorce-related homicide. The defendant argues that admission of the evidence, and his being subject to cross-examination about it, was highly prejudicial and erroneous.

The appellate court rejected this contention, and upheld admission of the evidence. We disagree as to the cyanide, and agree as to the clipping.

The general rule is that weapons are admissible if there is proof to connect them to the defendant and the crime. (*People v. Tribbett* (1968), 41 Ill. 2d 267, 270.) This rule does not require that the State prove that a given weapon was the one actually used in order to make it admissible. Where there is evidence that the defendant used a particular type of weapon and a similar weapon is found, the jury may reasonably infer that it was the one used to commit the offense. (*Tribbett*, 41 Ill. 2d 267.) However, when a completely different weapon or instrumentality is discovered this inference is weaker. At some point the chain of inferences becomes so attenuated that the probative value of the evidence is outweighed by its prejudicial effect.

We are of the view that, under all the circumstances, that line has been crossed in this case. Here, the State argues that possession of the poison was relevant to prove premeditation. However, the homicide in this case was not carried out in a premeditated fashion. It was committed suddenly and in the presence of witnesses. Thus, the "weapon" sought to be admitted could not have been used to carry out the crime as it occurred.

Moreover, the particular "weapon" admitted is perhaps uniquely prejudicial—a poison which has no medical use and is not available to the average person the way a firearm might be. We acknowledge that its possession has some probative value but, absent *some* connection to the crime beyond the bare inference that one who pos-

sesses cyanide must be a murderer, that relevance fails to outweigh the prejudice in the eyes of the jury.

With regard to the newspaper clipping, we do not perceive the danger of prejudice to be as great. Once again, the admissibility of evidence is generally left to the trial court's discretion, based upon a balance of probative value and prejudicial effect. (*People v. Monroe* (1977), 66 Ill. 2d 317.) Absent abuse, a court of review should defer to the trial court's discretion, even though it may have struck the balance differently. Applying this standard, we find that admission of the clipping was not an abuse of discretion.

The parties have presented several other issues, but because we find them unlikely to recur on retrial, we decline to discuss them. For all the reasons stated, the judgment of the appellate court is affirmed.

*Appellate court affirmed.*

JUSTICE STAMOS took no part in the consideration or decision of this case.