THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LINDA ANN HOOD, Defendant-Appellant.

First District (3rd Division) No. 1—88—0876

Opinion filed September 19, 1990.

Glenn Seiden and James A. Graham, both of Volpe, Seiden, Graham & Associates, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Kevin T. Noonan, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CERDA delivered the opinion of the court:

The defendant, Linda Ann Hood, was charged by indictment with the murder of her daughter, Michelle Hood. Following a jury trial, the defendant was found guilty but mentally ill (GBMI) and was sentenced to thirty years' imprisonment. On appeal, the defendant challenges the constitutionality of the GBMI statute (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j)) then in effect at the time of her trial. (Section 115—4(j) was amended during the pendency of this appeal.) The defendant further contends that the GBMI instructions were incomplete; that she was proved insane by a preponderance of the evidence; and that the evidence did not warrant submission of the GBMI instructions to the jury. We affirm.

The evidence reveals that on the morning of August 6, 1986, the defendant drove her children to the day care center and signed them in. The defendant decided, however, to take Michelle back home and

told Michelle's teacher she would bring her back later. After returning home, Michelle began "messing up" her parents' bed while the defendant was attempting to make it. The defendant took the cord from her bathrobe and tied it around Michelle's neck for a few minutes until Michelle collapsed. The defendant then knelt beside her daughter and continued strangling her. Thereafter, the defendant submerged Michelle under water in the bathtub fully clothed for a few minutes. The defendant removed Michelle from the bathtub, dried her and dressed her, and then placed her in bed. The defendant called her husband at work and told him to come home. Michelle was two months away from her third birthday at the time.

The defendant made a statement to the police admitting she killed her daughter and describing the incident. The defendant also told an officer that she placed Michelle in the bathtub in order to stop her from hurting. A detective testified that he observed ligature marks on the side of Michelle's neck and noticed tufts of hair missing from the child's head. A paramedic testified that upon arrival he observed bruises on Michelle's body, a large bruise on her forehead, and tufts of hair missing from her head. The record also reveals a previous incident on July 23 where the defendant choked Michelle with her bathrobe cord and then released the child when her face turned red. As a result of the choking incident on July 23, arrangements had been made for Michelle to attend a day care center with her sister. The defense theory at trial was that the defendant was insane at the time of the offense.

Doctor Karen Smith, a psychologist with the Psychiatric Institute of the Circuit Court of Cook County, testified that she examined the defendant on three occasions in 1987. During the evaluations, the defendant appeared withdrawn and detached from her emotions. Smith also noted that the defendant was in a dissociative state because the defendant described the incident as though someone else had performed the act. Smith testified that she diagnosed the defendant as having recurrent major depression and a compulsive personality disorder. Doctor Smith further testified that the defendant exhibited moderate psychomotor retardation, meaning that movements were slowed down, i.e., walking and talking. Smith also performed a psychological screening test, the results of which revealed that depression was interfering with the defendant's ability. In her opinion, the defendant was legally insane at the time of the offense.

On cross-examination, Smith stated that although she had never seen the defendant in 1986, she was able to determine the defendant's condition on the day of the incident in part from reports prepared by

the defendant's treating physicians, Doctor Teas and Doctor Conwall, who both had examined the defendant in 1986. Unlike Doctor Smith, however, Doctor Teas and Doctor Conwall did not find a compulsive personality disorder. Doctor Smith also discussed the third edition of the Diagnostic and Statistical Manual (DSM3) used in the field for diagnosing mental disorders. Smith explained that under DSM3, a diagnosis of major depression requires evidence that the patient has exhibited at least four of the eight major symptoms of depression every day for a period of two weeks. In reaching her diagnosis of major depression, Smith relied upon her conversations with the defendant and notes by other clinicians who had examined the defendant around the time of Michelle's death. Smith stated that the defendant exhibited: (1) a loss of interest or pleasure in usual activities and in sexual drive; (2) a loss of energy; (3) feelings of worthlessness or excessive guilt; and (4) recurrent thoughts of death or suicide. Smith conceded that under the revised edition, DSM3R, a diagnosis of major depression requires evidence of at least five symptoms. She further admitted that in the defendant's 42-page statement taken by a court reporter on August 6, the defendant did not describe the killing as if someone else had committed the offense.

The defendant's sister, Chris Duszynski, testified that the defendant attempted suicide in mid-October of 1984. Before the suicide attempt, Chris remembered the defendant as being outgoing, loving, very energetic and animated, and conscious of her family's needs. In September of 1984, however, the defendant began to change. The defendant barely talked and seemed overwhelmed by everything. Chris further stated that the defendant made a second, more lethal, attempt on her life four days after returning from the hospital. Thereafter, the defendant remained hospitalized until the Christmas holiday. In 1985, the defendant became extremely high and hyper, and then in June of 1986, the defendant slipped back into a depressive mood.

Doctor Jan Faucett, a physician and psychiatrist, testified that he interviewed the defendant in November of 1986. Doctor Faucett stated that at the time of the incident, the defendant was severely depressed in a major depression with psychotic features. He also agreed with Doctor Smith that the defendant was in a dissociative state. In his opinion, the defendant could not appreciate the wrongfulness of her act, and she could not conform her behavior to the requirements of the law. Faucett further testified that on the morning of his testimony, he was shown for the first time the notes of the defendant's treating physicians, Doctor Teas and Doctor Conwall. Faucett testified that their notes strengthened his opinion because the notes contained

evidence that the defendant was having mood swings between manic and depressive states. Faucett stated that after reading the doctors' notes, he modified his diagnosis from major depression to bipolar disorder or manic depressive disorder.

The State's cross-examination of Doctor Faucett revealed some inconsistencies between his report and the facts. For example, Doctor Faucett wrote in his report that the defendant developed symptoms of a depression a year before the killing, and he indicated that this conclusion was based upon the defendant's hospital records and his interview. Contrary to Doctor Faucett's report, however, the defendant was hospitalized two years before the killing. Faucett stated that he had no reports for the period covering 1985. Doctor Faucett also wrote in his report that the defendant's second suicide attempt took place in the garage of her mother's residence. In fact, however, the second attempt took place in the garage of defendant's residence. The doctor's testimony also raised questions regarding his work habits.

Doctor Mathew Markos, a forensic psychiatrist employed by the circuit court of Cook County (specializing in the evaluation of defendants facing criminal proceedings), testified that he interviewed the defendant on three occasions in 1987. Prior to his evaluations, he reviewed the report prepared by Doctor Smith, the notes by Doctor Teas and Doctor Conwall, the hospital charts, police reports, and a psychosocial summary prepared by a social worker. Markos testified that the defendant suffered from recurrent major depression, meaning that the depressive mood tends to occur at different times. Doctor Markos further stated that the defendant's major depression was associated with psychotic features. He concluded that the defendant was unable to conform her behavior to the requirements of the law and could not appreciate the criminality of her act.

On cross-examination, Doctor Markos testified that he also reviewed the results from an electroencephalogram performed on the defendant after his first interview. Markos stated that the results were insignificant as there was no evidence of any seizure disorder or brain lesion. Markos also testified that the purpose of the third interview was to determine whether the defendant was capable of understanding the *Miranda* warnings when she gave her statement to the police. He stated that there was no inconsistency between his finding that the defendant was capable of understanding the *Miranda* warnings on the day of the killing and his conclusion that she was also insane at the same time. Markos explained that they are two distinct issues determined by different criteria.

In rebuttal, the State presented the testimony of Doctor Teas. He

testified that he first met the defendant in October of 1984 after the defendant's first suicide attempt. He also saw the defendant after her second attempt. Teas agreed that the defendant had a compulsive personality trait. However, Teas disputed the finding that the defendant had been suffering from major depression. He diagnosed the defendant as suffering from atypical depression because the defendant did not meet the necessary criteria for a diagnosis of major depression as defined in DSM3. Doctor Teas prescribed medication to treat the defendant's condition. Teas further stated when he saw the defendant on August 2, four days before Michelle's death, the defendant's condition did not meet the minimum criteria for a diagnosis of major depression. According to Teas, the defendant was capable of appreciating the wrongfulness of her actions on August 2. He admitted, however, that the medication he prescribed would have masked any symptoms of illness.

During cross-examination and re-cross-examination, the defendant elicited testimony that DSM3 does not require a minimum of four symptoms to diagnose major depression where the patient suffers from a bipolar disorder, *i.e.*, mood swings, and the patient has had a previous period of major depression. Doctor Teas admitted that he had treated the defendant in 1984 as if she had major depression.

The last expert to testify, Doctor Henry Lahmeyer, stated that he saw the defendant in June of 1987. He also reviewed the reports prepared by Doctor Smith, Doctor Faucett, and Doctor Markos, the police report, and the hospital records. Doctor Lahmeyer testified that the defendant did not exhibit enough symptoms to make a diagnosis of major depression at the time of the killing. He stated that only three symptoms were present and that the defendant had not gone through a manic episode (hyper mood) as testified to by the other doctors. He explained that one of the doctor's notes used the term "hypomania," which is distinct from manic in that one who suffers from hypomania is not dysfunctional. Moreover, Lahmeyer did not even agree that the defendant had an episode of hypomania as such a finding would have required a sustained period of elevated mood which the treating doctors' notes did not support. In his opinion, the defendant was capable of appreciating the wrongfulness of her acts and could conform her behavior to the requirements of the law at the time of the offense. Lahmeyer further concluded that the defendant did not suffer from any classifiable mental illness.

On cross-examination, Lahmeyer agreed that if in fact the defendant had a manic episode, then it was possible that the defendant had major depression in August of 1986 since DSM3 does not require a

minimum of four symptoms to make such a diagnosis where depression is followed by a manic episode. He also admitted that if in fact the defendant was suffering from major depression, she could have been insane. Finally, Lahmeyer testified that in every case in which he has been called upon to render an opinion on the question of insanity, he has testified that the defendant was sane.

On appeal, the defendant contends first that the GBMI statute then in force during her trial was unconstitutionally vague. She further contends that the GBMI statute was unconstitutional because it did not bear a rational relationship to the public interest the statute was intended to serve. In so contending, the defendant focuses upon an anomaly, discussed by our supreme court in *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972, that existed because of the interrelationship between the then existing GBMI statute and the insanity defense. At the time of the defendant's trial, the GBMI statute provided:

> "When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned instead of a general verdict, but that such special verdict requires a unanimous finding by the jury beyond a reasonable doubt that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time." (Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j).)

Thus, a verdict of GBMI required the State to prove beyond a reasonable doubt that the defendant committed the crime charged, that the defendant was not insane, and that the defendant was mentally ill. (*People v. Fierer* (1988), 124 Ill. 2d at 185.) When the GBMI statute was first enacted in 1981, the affirmative defense of insanity required the defendant to introduce some evidence in order to place sanity in issue, and if a reasonable doubt as to the defendant's sanity was created, the State bore the burden of proving beyond a reasonable doubt that the defendant was sane. (Ill. Rev. Stat. 1981, ch. 38, pars. 3—2(b), 6—2(a).) Since 1984, however, a defendant who asserts the insanity defense bears the burden of proving insanity by a preponderance of the evidence. (Ill. Rev. Stat. 1987, ch. 38, pars. 3—2(b), 6—2(e).) The GBMI statute was not, however, correspondingly amended when the insanity defense was amended. As a result, there existed a "gap" between the respective measures of proof through which fell a theo-

retical class of defendants who could not be found insane by a preponderance of the evidence and who could not be found *not insane* beyond a reasonable doubt and who therefore had to be found simply guilty. (*Fierer*, 124 Ill. 2d at 189.) Stated another way, if the issue of sanity was a close question and the defense failed to meet its burden of proving insanity, and if the State failed to meet its burden of proving that the defendant was sane, then the jury was precluded by law from finding the defendant guilty but mentally ill or not guilty by reason of insanity and was therefore required to find him simply guilty. "If one of the goals of the GBMI verdict is to identify those in need of psychiatric treatment (see *United States ex rel. Weismiller v. Lane* (7th Cir. 1987), 815 F.2d 1106), the conflicting burdens of proof hinder[ed], rather than advance[d], that objective." (*Fierer*, 124 Ill. 2d at 190.) In *Fierer*, the supreme court found that the GBMI statute was "rife with potential confusion," but declined to resolve the question of whether the statute was "so awkward as to be unconstitutional." (*Fierer*, 124 Ill. 2d at 189.) After the present appeal was filed, the General Assembly amended the GBMI statute. Today, the accused bears the burden of proving by a preponderance of the evidence that he or she was mentally ill at the time of the offense. (Pub. Act 86—392, eff. Jan. 1, 1990; Ill. Rev. Stat. 1989, ch. 38, par. 115—4(j).) The defendant now asserts that the anomaly created by the statutory scheme then in force at the time of her trial rendered the GBMI statute unconstitutionally vague and irrational.

■■ ■ We agree with the State that the defendant lacks standing to challenge the statute on the grounds asserted. A party may not challenge a statute's constitutional validity unless that party has sustained or is in immediate danger of sustaining a direct injury as a result of the statute's enforcement. (*People v. Rogers* (1989), 133 Ill. 2d 1, 8-9, 549 N.E.2d 266; *People v. Palkes* (1972), 52 Ill. 2d 472, 480, 288 N.E.2d 469; *People v. Gurga* (1986), 150 Ill. App. 3d 158, 164, 501 N.E.2d 767.) Because the defendant was found guilty but mentally ill, she does not fall within that class of theoretical defendants who could have been precluded from a GBMI verdict despite their questionable state of mind. Further, having been found guilty but mentally ill, the defendant has been identified as a person in need of treatment. "One who would attack a statute as unconstitutional must bring himself within the class as to whom the law is unconstitutional." (*People v. Bombacino* (1972), 51 Ill. 2d 17, 19-20, 280 N.E.2d 697, quoted in *Rogers*, 133 Ill. 2d at 10.) Had the jury found Linda Hood simply guilty, we could have considered the matter for we then would have had before us a record from which it could be argued that

a defendant, having been found guilty, ought to have been found guilty but mentally ill. Accordingly, we decline to address the constitutional challenge.

■■ The defendant also argues that the jury instructions were in error because they failed to inform the jury that the State bore the burden of proving sanity and mental illness for a GBMI verdict. It is clear that a jury in a criminal trial must be instructed as to the elements of the offense charged, the presumption of innocence, and the burden of proof. (*People v. Fields* (1988), 170 Ill. App. 3d 1, 11, 523 N.E.2d 1196.) The pertinent instruction, the State's instruction No. 16, read as follows:

"To sustain the charge of murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of Michelle Hood; and

Second: That when the defendant did so, she intended to kill or do great bodily harm to Michelle Hood or knew that her acts created a strong probability of death or great bodily harm to Michelle Hood.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty, your deliberations should end, and you should return a verdict of not guilty.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, then you should go on with your deliberations to decide whether the defendant has proved by a preponderance of the evidence that she is not guilty by reason of insanity.

You may not consider whether the defendant has met her burden of proving that she is not guilty by reason of insanity until and unless you have first determined that the State has proved the defendant guilty beyond a reasonable doubt of the offense of Murder.

If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that she is not guilty by reason of insanity, you should find her not guilty by reason of insanity, your deliberations should end, and you should return the verdict of not guilty by reason of insanity.

If you find from your consideration of all the evidence that

the defendant has not proved by a preponderance of the evidence that she is not guilty by reason of insanity, then you should continue your deliberations to determine whether the defendant is guilty but mentally ill.

A special verdict of guilty but mentally ill shall be returned by you instead of a general verdict of guilty if you find each of the following propositions to be present in this case:

First: That the defendant is guilty of Murder; and

Second: That the defendant was not legally insane at the time she committed Murder: and

Third: That the defendant was mentally ill at the time she committed Murder.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should return the special verdict finding the defendant guilty but mentally ill on the charge of Murder.

If you find from your consideration of all the evidence that either the Second of Third propositions concerning the guilty but mentally ill verdict has not been proved beyond a reasonable doubt, you should return the general verdict finding the defendant guilty of Murder."

Thus, while the jury was properly advised as to the measure of proof required for a verdict of GBMI, it was not instructed as to who carried the burden of proving sanity and mental illness. It appears that this question has not been addressed in this State as the parties have not cited any authority, and we have not found any. However, the identical question was raised in the neighboring State of Indiana in *Green v. State* (Ind. 1984), 469 N.E.2d 1169. There, the Indiana Supreme Court found that their instructions adequately set forth the circumstances under which a jury could return a verdict of GBMI notwithstanding their failure to describe the burden of proof. (*Green*, 469 N.E.2d at 1174.) We too conclude that the jury instructions were adequate.

■ Jury instructions must be read as a whole. (*Fields*, 170 Ill. App. 3d at 11.) In addition to the State's instruction No. 16, the jury was also instructed that the defendant is presumed innocent throughout every stage of the trial; that the presumption is not overcome unless the jury is convinced beyond a reasonable doubt that the defendant is guilty; and that the State has throughout the case the burden of proving the defendant's guilt beyond a reasonable doubt. It is doubtful that the jury did not understand that the GBMI verdict, which as its name expresses is a verdict of guilty, required the State

to prove that the defendant was not insane but was mentally ill. Further, we find that the outcome would not have been any different had the State's burden been more accurately articulated. Therefore, the omission, even if error, was harmless.

 █ The defendant next contends that she was proved legally insane by a preponderance of the evidence. The issue of a defendant's insanity is a question of fact, and the jury's finding will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Martin* (1988), 166 Ill. App. 3d 428, 433, 519 N.E.2d 1085.) The defendant maintains that of the five doctors who testified at trial, only Doctor Lahmeyer stated that she was sane at the time of the offense. The defendant's treating physician did not render an opinion as to the defendant's condition on the day of the offense as he testified only to his examination and treatment of the defendant and her condition when he saw her four days before Michelle's death. Because Doctor Lahmeyer further testified that the defendant was not even mentally ill, the defendant asserts there was no evidence supporting a GBMI verdict. Since the jury rejected Doctor Lahmeyer's opinion that the defendant had no classifiable mental illness when it returned a verdict of GBMI, the evidence must have been sufficient to the jury to prove insanity by a preponderance of the evidence. This argument is without merit, however, because the defendant's own evidence introduced for the purpose of proving insanity indicated that the defendant was suffering from a mental illness and was sufficient to place the issue of mental illness before the jury. (*People v. Grice* (1984), 121 Ill. App. 3d 567, 569, 469 N.E.2d 1169.) The jury was free to accept the defense experts' diagnosis of her mental disorders and simultaneously reject their conclusions that she was legally insane. (*Grice*, 121 Ill. App. 3d at 569.) The jury was also free to reject the State's expert's opinion that she was not mentally ill while accepting his other opinion that she was not insane. (*Grice*, 121 Ill. App. 3d at 570.) Accordingly, we will not disturb the finding of the jury on the issue of insanity.

 The defendant's remaining contention that the trial court erred in submitting the GBMI instruction to the jury is disposed of in view of the preceding discussion. The decision whether to give the jury a GBMI instruction is within the discretion of the trial court. (*People v. McDarrah* (1988), 175 Ill. App. 3d 284, 297, 529 N.E.2d 808.) Both the State and the defendant are entitled to instructions presenting their theories of the case, and only slight evidence is needed to justify an instruction. (*People v. Isenberg* (1978), 60 Ill. App. 3d 325, 328-29, 376 N.E.2d 778.) Because the evidence intro-

duced by the defendant on the issue of insanity disclosed the presence of a mental illness, the trial judge was warranted in tendering GBMI instructions to the jury. *Grice*, 121 Ill. App. 3d at 569.

For the foregoing reasons, we affirm the judgment of the circuit court.

Judgment affirmed.

WHITE and FREEMAN, JJ., concur.