THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD CARTER, Defendant-Appellant.

First District (4th Division)   No. 86—2734

Opinion filed December 22, 1988.—Rehearing denied January 23, 1989.

594

Paul P. Biebel, Jr., and Randolph H. Stone, Public Defenders, of Chicago (James W. Younger, Jr., and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Patricia Y. Brown, Assistant State's Attorneys, and Jeanne A. Morrow, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

After a jury trial, Donald Carter was convicted of the murder of his wife, Rene Carter, and sentenced to 32 years in prison. He asserts several errors on appeal, including improper comments by the prosecutor; improper cross-examination; error in the admission of a witness' statement that defendant told her he would not let her telephone the police on him again; insufficiency of the evidence; and improper jury instructions on the requisites of voluntary manslaughter.

BACKGROUND

Sandra Pierce, sister of the victim, testified that she, her two sons, and the defendant lived together in Sandra's apartment. On August 18, 1984, defendant and his wife, Rene, were going out to celebrate because he had won $40 in the lottery. Sandra saw defendant and Rene at approximately 7 p.m. that evening. Shortly after midnight on August 19, defendant telephoned Sandra to see if Rene had returned to the apartment. He told Sandra that they had started arguing and that Rene had gone off with some men.

Fifteen to twenty minutes later, defendant rang the apartment bell in the lobby and Sandra buzzed him in. He went into the bedroom where Rene's daughter Gerviece was watching television and stayed for 15 minutes. He then returned to the front room, where Sandra was sitting. Rene came home approximately 15 to 20 minutes later and an argument broke out. Rene held an unopened bottle of beer which defendant grabbed away from her and poured out in the bathroom.

Defendant returned to the living room as Sandra passed him on her way to the bathroom. She heard defendant call Rene names and ask why she left him. Sandra heard someone go into the kitchen. As she started to leave the bathroom, Gerviece brushed past. She then saw defendant run by with one of her kitchen knives in his hand. She saw defendant leave through the front door of the apartment. At the same time, she heard mumbling from the kitchen. She went into the kitchen, where she saw her sister with blood coming out of her chest. Rene stumbled toward her and then fell on her.

Gerviece Pierce, Rene's 16-year-old daughter, testified that in the early morning hours of August 19, 1984, she was in her room watching television when the telephone rang. Her aunt, Sandra Pierce, came to her door and told Gerviece that defendant had told her during the telephone call that a gang had her mother. About 15 minutes later, defendant came home and entered Gerviece's room, where he sat down for awhile. He said, "I am going to kill that bitch."

When the doorbell rang and her mother returned, Gerviece went to the front room. She saw defendant snatch the beer bottle Rene was holding and pour it out. Gerviece saw Sandra go toward the bathroom after defendant returned to the front room. Defendant grabbed Rene and started to pull her out of the apartment, while Gerviece pulled her mother back in. Defendant was calling Rene names, and Gerviece tried to get between the two of them. Defendant hit Rene in the face and she fell on the couch. Gerviece ran to the kitchen to call the police. Defendant ran after her, grabbed the

phone, and told her that she was "not going to call the police on [him] this time." Gerviece ran out of the kitchen toward the front door. She last saw her mother alive standing in the doorway of the kitchen.

Gerviece called the police from a phone booth across the street from the apartment building. When she returned, the front door was open, blood was all around, and her mother was lying on the kitchen floor in the arms of Sandra Pierce.

Officer Eldridge Grimes testified that he received a call at 2:14 a.m. that someone had been stabbed and that he called paramedics when he arrived at the Pierce residence.

The medical examiner testified regarding Rene Carter's autopsy. There were four wounds to the body, an incised wound on the face; and oblique wound to the left chest, which caused massive bleeding into the chest cavity; an oblique stab wound to the left abdomen, which penetrated from the front of the body all of the way through to the back muscle; and a defensive wound through the left forearm. There were also an abrasion and bruise to the left leg and arm, respectively. The cause of death was multiple stab wounds.

The victim was 5 feet 5 inches tall and weighed 128 pounds. She had been drinking alcohol.

Officer John Blackman testified that he put defendant under arrest at the police station after defendant admitted that he had stabbed his wife. He noted no bruises on defendant, who was 6 feet 1 inch tall and weighed 178 pounds. Defendant had been drinking alcohol.

For the defense, Detective Al Grefsheim testified that he arrived at the homicide scene at 2:30 a.m. and talked to Gerviece for about 10 minutes. She was crying. The detective prepared a report summarizing his conversations with the witnesses. Nowhere in the report was her statement that defendant told her that he was going to "kill that bitch."

Defendant testified that he had decided to take his wife out after winning $40 in the lottery. They left home at 7 p.m. on August 18, 1984. After visiting a friend at a hospital they went to two different lounges, where they stayed a total of two or three hours. Then they went to a liquor store across from one of the lounges to buy a pint of gin. Defendant testified that three or four gang members approached him and ridiculed his clothing. Rene had been standing by the door of the store, but after he bought the gin and turned around, Rene was nowhere in sight. He testified that he was worried that gang members had taken his wife. He did not, however, call the po-

lice. Instead, he went to three different lounges looking for her. He then went back to a lounge where he met a friend and visited for half an hour. Defendant claimed that when he telephoned to see if Rene had returned home he spoke to Gerviece and not Sandra.

Defendant testified that when he returned home he did not press the bell for entrance but merely opened the vestibule door and went upstairs. The apartment door was unlocked so he walked in and went directly to the bedroom he shared with his wife. He found the light on and Rene in bed with another man. This other man got up, put his pants on, then hit defendant in the temple with his fist and ran past him, outside the backdoor in the kitchen. Defendant ran after the man but could not catch him, so he returned to the house. He and Rene began arguing and Gerviece tried to pick up the telephone. Defendant took it from her, stating that she was not going to call the police. Gerviece left and defendant saw his wife coming toward him with a knife in her hand. They fought over the knife and defendant finally disarmed his wife. Once he gained control of the knife, he swung it at her, after which he ran out of the apartment. He spent the night at his sister's home and turned himself in to the police the next day.

Defendant admitted he had killed his wife.

In rebuttal, the State called Sergeant Kobel, who had spoken with defendant at the police station on the morning of August 19, 1984. Defendant told Kobel he had found a man named Jay in bed with his wife but never said that Jay punched him. The sergeant saw no bruises or swelling on defendant, and defendant did not ask for medical assistance. Defendant did tell him that before he stabbed the victim he told her "he would show her what it is like to be stuck with a knife."

The jury returned a verdict of guilty of murder.

Defendant's motion for new trial was denied. He was sentenced to 32 years in the Illinois State Penitentiary.

OPINION

■■ ■ Defendant raises, for the first time in a supplemental brief on appeal, the question of whether the jury was properly instructed on the elements of voluntary manslaughter. The two instructions in issue are the Illinois Pattern Jury Instructions, Criminal, No. 7.04 and No. 7.06 (2d ed. 1981). These concern, respectively, voluntary manslaughter based on provocation and voluntary manslaughter based on an unreasonable belief that defendant's acts were justified. The Illinois Supreme Court has recently held that these instructions

misstate the State's burden of proof, which required the reversal of two defendants' murder convictions. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141.) The court in *Reddick* held that the improper instructions constituted grave error, requiring reversal, notwithstanding defendants' failure to object to the instructions or raise the issue on post-trial motion or even on appeal.

In the pending case, defendant urges this court to follow *Reddick*, reverse his conviction and enter an order for a new trial in which the jury may be properly instructed. The State counters that defendant has waived the issue and that *Reddick* should not be applied retroactively. In the alternative, the State maintains that any error concerning the instructions was harmless in light of the overwhelming evidence adduced against defendant.

In *Reddick*, the supreme court found that the voluntary manslaughter instructions, when given in conjunction with the murder instruction, "indicate that to obtain a voluntary manslaughter conviction the People must prove the existence of one of the alternative mitigating mental conditions which the People contend did not exist. By contract, the murder instruction makes no mention of the mitigating mental conditions. These instructions essentially assure that, if the jury follows them, the jury cannot possibly convict a defendant of voluntary manslaughter. The reason is that even if a mitigating mental state is proved, it will have been proved by the defendant, not the People." (*Reddick*, 123 Ill. 2d 184, 194-95, 526 N.E.2d 142, 145.) The State's burden, in fact, is to *disprove* the existence of the mitigating mental conditions of voluntary manslaughter beyond a reasonable doubt, not to prove their existence as the pattern instructions require.

In view of the supreme court's holding in *Reddick* that the jury instructions constitute grave error, we do not find the issue to be waived. We further determine, however, that the error here was harmless beyond a reasonable doubt. (See *People v. Fierer* (1988), 124 Ill. 2d 176; *Rose v. Clark* (1986), 478 U.S. 570, 92 L. Ed. 2d 460, 106 S. Ct. 3101.) Because we find the error harmless, we need not reach the issue of whether *Reddick* should be given retroactive application. *Cf. People v. Brooks* (1988), 175 Ill. App. 3d 136, (which applied *Reddick* retroactively and reversed a conviction for a new trial); accord *People v. Flowers* (1st Dist. November 21, 1988), No. 86—2441.

*Reddick* explains that the proof of a mental state associated with manslaughter is like an affirmative defense. (*Reddick*, 123 Ill. 2d at 195-97, 526 N.E.2d at 145-46.) Defendant must therefore produce enough evidence to put the defense in issue. At that point the bur-

den shifts to the State to disprove the mitigating mental conditions of voluntary manslaughter beyond a reasonable doubt. In the instant case, defendant was required to produce enough evidence supporting his belief that the killing was justified so as to shift the burden back to the State to prove that defendant had no such belief beyond a reasonable doubt. Here, the evidence showed that defendant was eight inches taller and 42 pounds heavier than his wife, he stabbed her to death with a knife while she was unarmed; he prevented the victim's daughter from telephoning the police during the incident; he stabbed the victim four separate times, with a defensive wound going through her forearm, a wound to the face, a wound to the left chest cavity causing massive bleeding and a wound to the left abdomen penetrating to the back muscle. Defendant's bare statement that his wife had come at him with a knife seems wholly insufficient to substantiate a manslaughter defense, because even if this statement were true, his right to defend himself lasted until he took the knife from her, which he testified that he did immediately. There was then no need to use deadly force. (See *People v. Thompson* (1977), 55 Ill. App. 3d 561, 371 N.E.2d 267.) There is no evidence that his wife stuck defendant with the knife or otherwise injured him in any respect. At that point he had not even an unreasonable belief that his infliction of four serious stab wounds was necessary to defend himself.

In addition to this evidence, the victim's daughter testified that defendant had stated to her that he would "kill the bitch." One of the investigating officers testified that defendant admitted telling his wife she would see what it was like to be stuck with a knife. All of the evidence, even defendant's testimony, establishes that he was angry, had a considerable advantage in terms of size and weapons, and could not have feared for his life, even unreasonably. Accordingly, the erroneous instruction based on unreasonable belief of justification did not cause grave error in this case.

To the extent defendant asserts a defense based on provocation (presumably seeing his wife in bed with another man), there is no evidence beyond his testimony to support this scenario in any respect. There was no physical evidence that another man was in the apartment, hit defendant and fled. There were other family members who flatly contradicted defendant's statements as to what had happened. Defendant's own version of events is certainly questionable; he claims he was able to enter the apartment's vestibule without buzzing and that he simply walked into the unlocked apartment and bedroom, where he saw his wife in bed with another man, who, he

claimed, got up and put on his pants before punching defendant and running out of the apartment. Apparently, this man did not leave behind articles of clothing, such as socks or shoes but got dressed while defendant stood there. He allegedly struck defendant, although he left no bruise. Defendant supposedly could not stop the man from leaving and chased him, unsuccessfully. It was after defendant's return to the apartment that his wife purportedly got the kitchen knife.

Since defendant's self-defense argument is triggered at that point it is unclear how he could have a provocation defense as well. Either he believed, however unreasonably, that he was defending himself from great bodily harm, or he was enraged at Rene's infidelity and struck out in a sudden, intense passion. By his own testimony, however, he did not kill her out of a sudden, intense passion. His testimony, the sole basis for either of the mitigating mental states, cannot support both at the same time, and, in fact, supports neither. See *People v. Clark* (1973), 15 Ill. App. 3d 756, 305 N.E.2d 218 (deliberate act of self-defense by defendant would negate an inference of intense passion necessary for conviction of voluntary manslaughter).

We conclude that, assuming defendant's inherently contradicting defenses were premised on enough evidence to shift the burden of proof to the State, the evidence shows beyond a reasonable doubt that the State sustained its burden of disproving those manslaughter defenses.

For these reasons, we hold that any error caused by the giving of the now discredited pattern instructions was harmless beyond a reasonable doubt on this record. See *People v. Bailey* (1986), 141 Ill. App. 3d 1090, 1104, 490 N.E.2d 1334 (any error in refusing instruction is harmless where evidence is so clear and convincing that jury's verdict could not have been different).

■ Of defendant's remaining arguments, the least persuasive is the reasonable doubt issue. Based on the evidence recited in this opinion, we find that the State proved defendant guilty beyond a reasonable doubt.

■ Defendant also argues that he was denied a fair trial, based on three errors. First, he states that the prosecution's closing and rebuttal argument improperly aroused the passions of the jury. This is based on the prosecutor's statements that defendant was a "liar" who was trying to "dirty up" the victim with the adultery story and that the defense was "gobbledygook." Further, the prosecution commented that Rene was "looking down" on the jurors and that they should not make the result of their deliberations "Christmas Day for killers."

The State is allowed wide latitude in closing arguments. (*People v. Davis* (1982), 104 Ill. App. 3d 512, 516, 432 N.E.2d 1134.) The prosecutor is entitled to comment on the evidence, draw inferences therefrom, and comment on the accused's credibility. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847.) We do not find that the comments in the pending case were so out of line as to constitute reversible error.

■ Second, defendant argues that he was denied a fair trial because the State asked defendant if Sandra and Gerviece had told the truth when they testified. Asking a party if an adverse witness's testimony is truthful does not appear to be an especially effective cross-examination device. Even assuming it is intended to contrast the credibility of prosecution witnesses with that of defendant, we cannot say that such questions denied defendant a fair trial or invaded the province of the jury.

■ The final point of error concerns the admission of testimony suggesting that police had been called to the home previously because of fights between defendant and the deceased. The victim's daughter testified that when she attempted to call the police on the night of the killing, defendant snatched the telephone, telling her that she was not going to call the police "again." We do not find this to be unduly prejudicial. It is a statement attributed to the defendant during the fight between him and the deceased and as such is probative of his mental state. It does not, standing alone, introduce evidence of other crimes that defendant may have committed.

We conclude that the conviction and sentence of defendant should be affirmed.

Affirmed.

JIGANTI, P.J., and McMORROW, J., concur.