THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JIMMY LEE RIGGINS, Defendant-Appellant.

First District (6th Division)   No. 1—87—2446

Opinion filed October 26, 1990.

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, and Schiff, Hardin & Waite, both of Chicago (James A. Clark and Colette Holt, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Daniel G. Galivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Jimmy Lee Riggins, was convicted of murder and armed violence, and subsequently was sentenced to a 25-year prison term. Defendant appeals, contending that the State failed to prove beyond a reasonable doubt that he did not act in self-defense; that the submission of Illinois Pattern Jury Instructions on murder and voluntary manslaughter constituted grave error requiring reversal; and that the trial court erred in permitting certain improper impeachment of defendant.

The facts are as follows. Defendant testified that during the afternoon of June 30, 1986, he received kidney dialysis treatment at Jackson Park Hospital. At approximately 7:50 p.m., defendant left the hospital and went home. He lay down because he was feeling weak. He later arose and proceeded to the Black Marble Lounge. He stated that he still felt woozy and weak.

Defendant stated that when he arrived at the lounge, the first person he spoke with was the decedent, Kevin Williams. Williams and he had spent a lot of time together. Williams was seated at the bar with his back to the front door. After defendant purchased a package of cigarettes at a vending machine, Williams approached the other side of the vending machine and stood approximately four feet away from defendant. Williams then said, "All women are bitches." Defendant responded that he did not have anything to do with that. Williams began making derogatory comments about women, and referred to defendant's wife and mother, as well as his own mother, as bitches. Defendant told Williams not to make such comments about defendant's mother. He also told Williams that he was going to leave this alone because Williams was trying to cause a problem.

Defendant stated that after speaking with Williams, he felt that the best thing to do would be to leave the lounge. Before leaving, defendant finished smoking a cigarette and told Tommy Taylor, another patron, that he was leaving. Defendant stated that he pulled the inner door of the lounge open and began to walk out of the door. As soon as he had the door open, defendant felt himself being attacked from behind. He stated that Williams grabbed him and slammed him against the pillar located in the entranceway. Defendant's head struck the pillar, and he feared that the surgical implants in his arm might be torn out by the attack. At the time of the attack, defendant was facing south, in the direction of the lounge door.

Defendant testified further that the pillar in the lounge entranceway was constructed of concrete or marble. Defendant noted that he received a small bump on his head as a result of being thrown against

the pillar. He stated that there were no visible marks on his head because he was wearing a leather hat.

Defendant stated that after Williams slammed him into the pillar, Williams jammed his forearm under defendant's neck. When Williams did so, defendant reached into his rear pocket and removed his knife. He flicked it open with his right hand and stabbed Williams. Defendant had no trouble opening the folding knife with only one hand. Defendant admitted that Williams was not choking him to death, and he knew that Williams was not armed. He also knew that Williams had been barred from drinking at the lounge, and this fact contributed to his fear and entered into his decision to use the knife. He had heard about Williams "hitting guys with stools and stabbing other people." He thought that Williams was trying to kill him because of their conversation and the fact that defendant did not want to talk about it anymore.

Following the stabbing, Williams backed out of the entranceway and dropped to his knees. Defendant denied attempting to stab Williams while Williams was on the ground. Defendant stated that Williams suddenly jumped back up as if he was going to charge at defendant. Defendant changed the position of the knife so that he was holding the handle in his clenched fist with the blade extending downward. Williams remained standing for a few seconds and then turned and walked to the corner. Defendant stated that at this point, he heard John Jones shout to him, "[d]on't do that." Defendant turned, closed the knife and put it away. He then got into his car and drove away.

As defendant drove away, he saw Williams on the trunk of a nearby car with his shirt pulled up. Richard McNeal and Vinckley Harris stood near Williams. Defendant proceeded to an acquaintance's house, where he placed an ice pack on his head. Defendant left the acquaintance's house several hours later. At that time, he saw Officer David Cristovic following him in a marked squad car. Cristovic stopped defendant, performed a pat-down, and recovered a knife from defendant's pants pocket. He told defendant he was under arrest for murder and advised defendant of his constitutional rights. Defendant said that when Cristovic informed him he was being arrested for murder, he responded, "Oh, man, the guy died?"

When placed under arrest, defendant admitted that he had stabbed Williams, but stated that he acted in self-defense as Williams had struck him in the face. (Defendant later denied telling the police that Williams had struck him in the face. He subsequently admitted that although it was possible he had said so, Williams did not punch

him in the face.) Cristovic testified that defendant told him that the knife in his pocket was not the knife with which he had stabbed Williams. He claimed to have thrown that knife on nearby railroad tracks. At the station, however, defendant admitted that the knife in his pocket was the knife that he used to stab Williams.

Cristovic testified that he saw no marks, scratches, injuries, abrasions or bruises of any kind on defendant. Officer Torence Davies, who interviewed defendant, corroborated Cristovic's testimony in this regard. Additionally, intake photographs of defendant taken upon his arrival at jail reveal no injury.

Defendant testified that when he was taken to the jail, he told the paramedic and the doctors at Cermak Hospital that he had a head injury. He stated that the doctors informed him that he had a concussion. Defendant's evaluation upon intake at the jail, however, revealed no marks, bruises, cuts or swelling anywhere on defendant's body. The examining paramedic, Lenn Huffman, stated that defendant never indicated that he had any pain or injury to his head. Huffman testified that he specifically asked defendant if he had a head injury and that defendant replied that he did not. Defendant signed Huffman's report following the examination.

A subsequent treating physician, Dr. Michael Puisis, testified that he had examined defendant several times, and that neurologists and other physicians also had examined him. None of the doctors ever found any evidence of an injury to defendant's head.

During direct examination, defendant testified that he previously had been convicted of cocaine possession. On cross-examination, he testified that the conviction was not for possession of cocaine, but, rather, was for possession of a controlled substance with intent to deliver. He was on probation for that offense when he stabbed Williams.

Cortez Mack was tending bar at the lounge on the night of the incident. He testified that defendant came into the lounge at approximately 9 p.m. Mack saw Williams at the same time. Defendant did not drink anything and only stayed five minutes. Mack did not see defendant and Williams argue, nor did he see Williams do anything that would have given defendant cause to stab him.

Vinckley Harris was a patron in the lounge on the evening of the incident. He arrived at the lounge with Williams at approximately 10 p.m. He observed Williams and defendant near the cigarette machine. It appeared that defendant and Williams were having a mild argument. Harris walked to the front of the lounge, where he heard defendant tell Williams that the best thing he could do would be not to say anything else to defendant. Harris did not hear Williams say

anything to defendant after that. Harris then left the lounge and stood on the corner.

As Harris stood on the corner, he heard the outer screen door of the lounge hit the building as it flung open. He turned around and saw Williams coming out the door backwards. Defendant was facing Williams and coming out after him. Defendant followed Williams onto the grass where Williams fell to the ground. While Williams was on the ground, defendant "came at him." Williams was kicking and throwing his hands, attempting to keep defendant off him. Defendant had a knife and was trying to stab Williams while Williams was on the ground. Harris said that defendant had the knife raised while standing over Williams. At that point, John Jones shouted at defendant to stop. Defendant then backed away, got into his car, and drove off.

Harris and the other men outside the lounge helped Williams to a car. Williams told them he had been stabbed. Williams lifted up his shirt and grabbed the wound as blood began "gushing out." Williams was taken to Jackson Park Hospital, where he died as the result of a single stab wound to the chest.

Harris testified that defendant and Williams were friends. Harris estimated that Williams and defendant saw each other at least once a week during the summer of 1986.

John Jones testified that at approximately 10:30 p.m. on the night of the incident, he was standing in front of the lounge. Jones was able to see the lounge door as well as the area between the door and the black pillar. Insofar as the events occurring outside the lounge are concerned, Jones' testimony mirrored that of Harris.

Jones further testified that he had known Williams for approximately 15 years and that he never before had seen Williams involved in any altercations at the Black Marble Lounge. Willie Jett, a former bartender at the lounge, however, testified that Williams had been barred from the lounge because he had caused trouble in the past. Jett stated that Williams had hit him with a bar stool.

Richard McNeal was also outside the lounge when defendant stabbed Williams. His testimony corroborated that of Harris and Jones regarding the actions which occurred outside the lounge as Williams backed out with defendant after him. McNeal did not see defendant stab Williams, but he did see defendant trying to stab Williams. He never saw Williams strike defendant.

At the close of all the evidence, defendant moved for a directed verdict, contending that the State failed to prove beyond a reasonable doubt that his use of force was not justified. The court denied the mo-

tion. On appeal, defendant first challenges the propriety of that ruling. We find no merit in defendant's contention.

■■ A defendant's motion for a directed verdict requires the trial court to consider whether a reasonable mind could fairly conclude the guilt of the accused beyond a reasonable doubt, considering the evidence in the light most favorable to the State. (*People v. Withers* (1981), 82 Ill. 2d 224, 429 N.E.2d 853.) More specifically, because defendant here raised the affirmative defense of self-defense, the trial court must consider whether a reasonable mind could fairly conclude that the State proved beyond a reasonable doubt that defendant did not act in self-defense when he stabbed and killed Williams. (*People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681.) We find that a reasonable mind could fairly conclude that the State proved beyond a reasonable doubt that defendant did not act in self-defense.

■■ In order to successfully utilize the affirmative defense of self-defense, a defendant must demonstrate the following: that force has been threatened against him; that he is not the aggressor; that the danger of harm is imminent; that the force threatened is unlawful; that he actually believes a danger exists, that the use of force is necessary to avert the danger and that the kind and amount of force which he used was necessary; and that the above beliefs are reasonable. (Ill. Rev. Stat. 1985, ch. 38, par. 7—1; *People v. Williams*, 57 Ill. 2d 239, 311 N.E.2d 853.) The use of deadly force is limited to those situations in which the threatened force will cause death or great bodily harm, or the force threatened is a forcible felony. Ill. Rev. Stat. 1985, ch. 38, par. 7—1.

Defendant testified that Williams started an argument with him, attacked him from behind as defendant attempted to exit the lounge, and continued to attack him after the two men were outside of the lounge. Defendant knew that Williams was not choking him to death and that Williams was unarmed. Nevertheless, defendant used deadly force to ward off the attack. He stated that he stabbed Williams in an effort to prevent Williams from harming him. Defendant claimed he reasonably believed his use of force was necessary because Williams had been violent in the past. Defendant admitted, however, that he did not know whether it was really true that Williams had hit someone with a bar stool. Nor was he able to provide an example of Williams beating up other people. Defendant nonetheless maintains that his testimony was uncontradicted and that, accordingly, the State failed to prove he was not acting in self-defense.

In our view, the State provided sufficient evidence to refute defendant's contention that he was acting out of self-defense. Three

witnesses who were outside the lounge testified that they saw Williams backing out of the lounge door with defendant pursuing him. These witnesses also testified that defendant pursued Williams even after Williams backed out of the entranceway, across the sidewalk and onto the grass where he fell. Two of the witnesses testified that they saw defendant try to stab Williams while Williams was lying on the ground. The other witness testified that Williams was "kicking his legs trying to protect himself."

Significantly, none of these witnesses testified that Williams jumped back up as if he were going to charge defendant. In fact, no witness, aside from defendant himself, testified that Williams had struck, pushed, shoved or otherwise physically touched defendant in any manner. Moreover, although Harris heard defendant and Williams arguing, he stated that it was not a significant argument. Mack testified that he heard no argument at all. And, although defendant testified that he was bruised by Williams' attack, there was no evidence of physical injury, and defendant signed a statement that he had no head injury.

■ We believe that the jury properly resolved any conflicts in the testimony and determined that the evidence was more than ample to permit it to conclude that the stabbing was not done in self-defense. The jury reasonably could have concluded beyond a reasonable doubt that at the time of the stabbing, defendant was the aggressor; that the danger of harm to defendant was not imminent; and that defendant did not believe, either reasonably or unreasonably, that the force which he executed was necessary to prevent imminent death or great bodily harm to himself. See *People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866.

Moreover, we find that the jury's resolution is particularly appropriate in light of the State's substantial impeachment of defendant's testimony. Defendant testified that Williams slammed him against a pillar and pinned him there by jamming his forearm under defendant's neck. He claimed he feared Williams because of Williams' reputation for violence. He admitted, however, that he did not know whether Williams actually had ever attacked anyone. Moreover, Cristovic, Davis and Huffman, all of whom closely observed defendant within hours of the stabbing, testified that defendant had no injuries. In fact, after the incident, defendant did not go to the police or seek medical treatment. Instead, defendant drove to a friend's house to get ice for his head. His friend, whose last name or address defendant did not know, did not even own a refrigerator. Further, defendant signed a report which indicated that he had not complained of head injuries.

The jury had the opportunity to see close-up photographs of defendant's head, face and neck. These photographs reveal no injury.

Furthermore, defendant initially claimed that the knife recovered from him was not the knife used to kill Williams. He later admitted that this was a lie. Defendant also initially denied telling the police that Williams had punched him in the face. He later admitted that it was "possible" that he did tell these things to the police. He then testified that the victim did not hit him in the face.

In our view, defendant's testimony was impeached to the extent that the jury properly could have found it implausible. Thus, in light of the other testimony presented at trial, the jury properly could have concluded that the State had proved beyond a reasonable doubt that defendant was not acting in self-defense and that defendant was guilty of murder.

Defendant next contends that his murder conviction must be reversed because the jury instructions on murder and voluntary manslaughter misallocated the State's burden to disprove the existence of a mitigating mental state. In *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, our supreme court held that the giving of the Illinois Pattern Jury Instructions (IPI) on murder and voluntary manslaughter was grave error. The jury in this case received the erroneous IPI instructions on murder and voluntary manslaughter.

Initially, we note that very recently our supreme court held that the *Reddick* error is not to be applied retroactively. (*People v. Flowers* (1990), 138 Ill. 2d 218.) *Flowers*, however, concerned itself with collateral attacks, so we will consider the *Reddick* claim as being applied retrospectively in the present direct appeal.

■ The error cited in *Reddick* occurs because the voluntary manslaughter instruction in conjunction with the murder instruction fails to inform the jury that the State bears the burden of disproving the mitigating mental states necessary to reduce a murder charge to manslaughter. (*People v. Fercsi* (1989), 182 Ill. App. 3d 13, 537 N.E.2d 912.) Such a combination of instructions, if followed by a jury, eliminates the possibility of a defendant being convicted of voluntary manslaughter, as the only way a mitigating mental state can be proved is by the defendant, rather than by the State. (*People v. Fercsi*, 182 Ill. App. 3d 13, 537 N.E.2d 912.) Nonetheless, an erroneous instruction is harmless if the result of the trial could have been the same had the proper instruction been given. (*People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.) Thus, a *Reddick* error can be harmless when a defendant fails to present sufficient evidence to justify reducing the charge from murder to voluntary manslaughter. See, *e.g., People v.*

*Daniel* (1989), 191 Ill. App. 3d 837, 548 N.E.2d 354; *People v. Thomas* (1989), 185 Ill. App. 3d 1050, 542 N.E.2d 100; *People v. Skipper* (1988), 177 Ill. App. 3d 684, 533 N.E.2d 44; *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531.

In *People v. Carter* this court addressed a factually similar situation, holding that the defendant's murder conviction need not be reversed because the *Reddick* error was harmless beyond a reasonable doubt. The court concluded that the defendant could not have feared for his life, either reasonably or unreasonably, based upon the following: there was no evidence that the victim injured the defendant in any way; the victim was unarmed; the defendant was physically larger than the victim, who was stabbed four times. The defendant's own testimony, as in the present case, was the only evidence in the record to support his claim that he acted in self-defense or with an unreasonable belief that he was acting in self-defense.

Another similar case was decided by this court in *People v. Williams* (1989), 205 Ill. App. 3d 751. In *Williams*, this court affirmed the defendant's conviction for murder, despite the fact that the trial court gave erroneous *Reddick* instructions. The court concluded that no evidence existed in the record which supported defendant's contention that he could have unreasonably believed that circumstances existed which would justify the killing. The *Williams* court highlighted the following facts: the defendant carried a weapon on his person; the victims were unarmed; no evidence existed of any physical injury to the defendant or of any altercation between the parties. Further, two witnesses testified that they saw the victims plead with the defendant and try to fend him off. Again, as here, the only evidence which supported defendant's unreasonable belief of justification was the defendant's own testimony.

We find the present case to be similar to *Carter* and *Williams* in that the evidence of the defendant's alleged belief in self-defense was contradicted by three witnesses who were present. While they did not see the actual stabbing, three witnesses testified that the victim backed out of the lounge after being stabbed, with defendant in pursuit. Defendant pursued the victim and continued his attack even after Williams had fallen to the ground. Two witnesses testified that defendant tried to stab the victim while the latter was lying on the ground. Another witness testified that he saw the victim while on the ground kicking to protect himself. A witness in the lounge testified that although the victim and defendant were arguing, it was not a heated argument. The bartender heard no argument at all. Further, as in *Carter* and *Williams*, defendant's account of an attack by the

victim was belied by defendant's lack of any injury. No evidence existed of any physical injury to defendant and, in fact, defendant told the examining paramedic that he had no head injury and signed a statement to that effect. Finally, like the victims in *Carter* and *Williams*, the victim here was unarmed. Nevertheless, defendant used deadly force.

■ The only contrary testimony was that of defendant himself. As noted above, however, defendant's testimony is replete with inconsistencies and admitted lies, and the jury was entitled to accord it little weight. We believe that the record, when viewed as a whole, demonstrates that defendant could not have feared for his life, not even unreasonably. Defendant failed to produce sufficient evidence to prove that he either reasonably or unreasonably believed that he was in danger and, therefore, has failed to demonstrate the mitigating mental condition of voluntary manslaughter required to shift the burden of disproving his belief to the State. In light of our findings above, we find that the instructions error was harmless. The State has overwhelmingly proved defendant guilty of murder, and in our view, the record does not support a different result. Thus, any error engendered by the erroneous instructions was harmless beyond a reasonable doubt. See *People v. Skipper*, 177 Ill. App. 3d 684, 533 N.E.2d 44; *People v. Carter*, 177 Ill. App. 3d 593, 532 N.E.2d 531; *Cf. Falconer v. Lane* (7th Cir. 1990), 905 F.2d 1129, 1136 (erroneous *Reddick* instructions were not harmless because although the record showed that the jury could rationally have rejected the defendant's theory of self-defense, the record did not demonstrate that "the jury could not have reasonably found that the killing was the result of provocation or unreasonable belief of justification").

Defendant finally contends that the trial court erred in permitting the State to impeach him on a matter not raised during direct examination and collateral to the substantive issues in the case. Defendant specifically complains of the State's line of questions regarding whether, and when, defendant was advised of his constitutional rights.

■ Cross-examination is limited to matters raised during direct examination. (*People v. Rudi* (1981), 94 Ill. App. 3d 856, 419 N.E.2d 646.) It is improper to ask a question merely for the purpose of contradicting the witness. (*People v. Rudi*, 94 Ill. App. 3d 856, 419 N.E.2d 646; *People v. Persinger* (1977), 49 Ill. App. 3d 116, 363 N.E.2d 897.) Nonetheless, the scope of cross-examination ordinarily rests within the discretion of the trial court, and the trial court's determination regarding that scope will not be disturbed absent an abuse of discretion. (*People v. Watkins* (1974), 23 Ill. App. 3d 1054,

320 N.E.2d 59.) We find that, here, the trial court did not abuse its discretion.

■■ During defense counsel's direct examination of defendant, defendant was asked whether the arresting officer had informed him of the charges against him, what his reply was to having been informed that he was being arrested for murder, and what else the arresting officer had said to him. Defendant was questioned about statements he made to the police concerning the location and identity of the murder weapon and about other statements he made to the police.

During cross-examination, over defendant's objection, the prosecutor asked defendant if he had been advised of his constitutional rights, and defendant responded that he was not advised of his rights until he was within two to four blocks of the police station. On rebuttal, the prosecutor was permitted to perfect the impeachment of defendant's testimony, again over defense counsel's objection, by eliciting testimony from Cristovic that defendant was advised of his constitutional rights before he was placed in the squad car.

In our view, the trial court properly permitted the prosecutor to question defendant regarding this issue. Defense counsel's questions regarding statements defendant had made to the police opened the door to this line of questioning. The jury was entitled to know the context in which defendant made these statements. Moreover, once defendant claimed he had not been advised of his rights immediately upon arrest, the State was entitled to rebut this testimony by calling Cristovic to testify to the contrary. The issue was material as it directly affected the weight his statements would be given by the jury. (See *People v. McGhee* (1974), 20 Ill. App. 3d 915, 314 N.E.2d 313.) Thus, we find the trial court properly overruled defense counsel's objections to the prosecutor's questioning. Moreover, if any error occurred, it was harmless.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LaPORTA, P.J., and RAKOWSKI, J., concur.