THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ORLANDO ROSA, Defendant-Appellant.

First District (6th Division)   No. 1—87—3610

Opinion filed December 7, 1990.

Randolph N. Stone, Public Defender, of Chicago (Tina Liebling, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and David S. Meyerson, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Following a jury trial, defendant, Orlando Rosa, was found guilty of one count of attempted murder and of one count of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1). The trial court sentenced defendant to concurrent terms of 40 years for the murder conviction and 20 years for attempted murder.

On appeal, defendant contends that (1) he was deprived of his rights to a jury trial and to equal protection by the prosecutor's exclusion of black jurors through the use of peremptory challenges; (2) his murder conviction must be reversed because the murder and voluntary manslaughter jury instructions erroneously set forth the State's burden of proof on the issue of self-defense; (3) he was deprived of his right to a fair trial by improper comments made by the prosecutor during closing argument; and (4) his sentences were excessive, an abuse of the trial court's discretion, and based upon improper factors.

The record reveals that defendant, Orlando Rosa, was charged along with Pedro Rodriguez and Roger Gonzalez with two counts of murder, three counts of armed violence, one count of attempted murder, and three counts of aggravated battery. The trial court granted motions for severance, and defendant Rosa was tried separately from Rodriguez and Gonzalez. The court granted the State's motion to nol-pros the armed violence and aggravated battery counts. After a jury trial, defendant was found guilty of murder and attempted murder and sentenced to a 40-year term for murder and to a concurrent 20-year term for attempted murder.

During jury selection, 23 members of the venire were questioned, and the trial court excused two venire members for cause. Defense counsel exercised five peremptory challenges, and the prosecution exercised four such challenges. The record does not disclose how many of the 23 veniremen or the 12 seated jurors were black. Prior to the swearing in of the jury, defense counsel objected and moved for a mistrial, asserting that three of the four peremptory challenges exercised by the prosecution were against blacks, denying defendant his right to a jury comprised of a fair cross-section of the community. The trial court denied defendant's motion for a mistrial.

The evidence adduced at trial established that on August 9, 1985, defendant was a member of the Spanish Gangster Disciples (Disciples), a street gang in Chicago, Illinois. That evening, defendant drove to Hammond, Indiana, with Rodriguez and several other members of the Disciples. In Hammond, the Disciples encountered two carloads of members of the Latin Kings, a rival Chicago street gang. Rodriguez

testified that when they were in Hammond, one of the Disciples had been stabbed by a member of the Latin Kings and members of the Disciples wanted to retaliate. Defense counsel's objections to this evidence were sustained, and the testimony was stricken. Defendant and Rodriguez eventually returned to Disciple territory in Chicago, and later that night defendant and Rodriguez entered a van with Gonzalez and drove with 10 to 20 other Disciple members to an area dominated by Latin Kings. Defendant said that he had a gun at that time.

Defendant, Rodriguez, and Gonzalez separated from the other members of their gang and subsequently walked into an alley between Escanaba and Muskegon streets. Rene Aguinaga, Jaime Aguinaga, and Isidoro Perez, all members of the Latin Kings gang, were in a backyard which was adjacent to the alley in which defendant and the others were walking. The Aguinagas and Perez heard the shouting of rival gang slogans and saw approximately 15 Latin Kings running down the alley. They walked into the alley and subsequently encountered defendant, Rodriguez, and Gonzalez, who were yelling Disciple slogans. As Jaime Aguinaga and Perez turned to run, Gonzalez shot Jaime Aguinaga in the left thigh. Another shot rang out as Jaime Aguinaga fled the scene, and he turned around and saw defendant holding a gun in his hand.

When the police arrived on the scene, they found Perez barely conscious and lying facedown in a yard next to the alley. Perez had a bullet wound in his lower back and identified Gonzalez as the person who shot him. Perez later died as a result of the gunshot wound. Jaime Aguinaga was treated at a hospital for the gunshot wound in his thigh, and when questioned by the police, he identified Gonzalez as the person who shot him.

Later that night, defendant stated that he believed that he had shot a Latin King. Although defendant had a gun with him earlier in the evening, the gun was gone when he awoke in the hospital later that same night after he was knocked unconscious in an unrelated tavern altercation. Defendant was identified in a lineup as one of the people who had been with Gonzalez at the time of the shooting. After his arrest, defendant gave the police an oral statement that was subsequently summarized and reduced to writing. Defendant's statement described the circumstances of the shooting and was admitted against him at trial.

Chicago police detective George Basile and Assistant State's Attorney James Andreou testified at trial that they had interviewed defendant, and he had stated that on August 9, 1985, he was with some of his friends in Hammond, Indiana, where they got involved

with some Latin Kings. Defendant stated that the Latin Kings had gotten the better of them, and one of the members of the Disciples had been beaten up. Defendant stated further that he decided he wanted to get even with the Latin Kings and that the Disciples were out looking to get the Latin Kings.

During closing argument, the prosecutor referred to evidence that had been excluded, as follows:

"And the reason that Arthur Rodriguez was not able to tell you directly that he and the other guys were going in that van when they went out on the hunt to get themselves a Latin King, because of what happened to their friend in Hammond, is because when I asked him, [defense counsel] jumped out of his seat and objected."

The trial judge twice overruled defense counsel's objection to this argument. The prosecutor then continued as follows:

"That's why Arthur was not able to sit there and tell you in detail why they went out on the hunt, not because he didn't know it, and he shouldn't be held at fault, because of [defense counsel's] objections."

The trial court's instructions to the jury included the Illinois Pattern Jury Instructions on murder and voluntary manslaughter. The jury found defendant guilty of murder and attempted murder. Defendant called two witnesses who offered evidence in mitigation at the sentencing hearing. In sentencing defendant to a 40-year term for murder and a concurrent 20-year term for attempted murder, the trial judge stated that he had read and considered the presentence report, had considered the testimony of the witnesses and the statements of counsel relevant to sentencing, and recalled and considered the evidence presented at trial. The judge also made the following comments:

"[T]here is no question by that the lack of a father, a responsible father in the home where children are being raised is a serious matter.

It begins with the stupidity and slutliness of women who give themselves over to unresponsible men who are gone when the children that these great love affairs produce are born or shortly afterwards.

Quit[e] naturally and unfortunately from these unions, children like the defendant are produced, uneducated, practically illiterate, ignorant, not only disrespectful of authority and others, but slovenly, stupid. And having these qualifications, they [quite] naturally are drawn into city street gangs where all of

these qualities predominate.

And once they are joined together in a gang, another outstanding feature emerges for which these street gangs are best known, and that's coward[ice], the most cowardly people ever to soil the streets of this or any other city.

\*\*\*

But the fact is that this case, as bad as it is, if not identical, it's the same as hundreds of other murders and attempted murders committed in this city in the past 20 years.

\*\*\*

And the law, of course, is woefully inadequate and miserably failing the citizens, with the result that citizens by the hundreds of thousands who can leave the cities are doing so. And the population of the kind of people who produce street gangs continues to increase.

So the future of the cities, the old industrial cities [a]cross this country is dim, dismal and unfortunate."

We initially consider defendant's claim that he was deprived of his rights to a jury trial and to equal protection by the prosecutor's exclusion of black jurors through the use of peremptory challenges.

■ To assert an equal protection violation, a defendant must first establish a *prima facie* case of purposeful discrimination. (*Batson v. Kentucky* (1986), 476 U.S. 79, 93-94, 90 L. Ed. 2d 69, 85-86, 106 S. Ct. 1712, 1721.) In order to establish a *prima facie* case of discrimination and to provide for meaningful appellate review, the trial record must disclose the race of the veniremen. *People v. McDonald* (1988), 125 Ill. 2d 182, 194-195, 530 N.E.2d 1351, 1356; *People v. Mitchell* (1987), 163 Ill. App. 3d 58, 69, 516 N.E.2d 500, 507; *People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1085, 502 N.E.2d 304, 311.

In the instant case, 23 members of the venire were questioned, and the trial court excused two venire members for cause. Defense counsel exercised five peremptory challenges, and the prosecution exercised four such challenges. Although defense counsel asserted that three of the four peremptory challenges exercised by the prosecution were against blacks, the record does not disclose how many of the 23 veniremen or the 12 seated jurors were black.

■■ We find that this record is insufficient to establish a *prima facie* case of discrimination. Because the record does not indicate the race of the prospective or seated jurors, this court cannot determine whether the prosecution employed purposeful discrimination to exclude blacks during jury selection. (*McDonald*, 125 Ill. 2d at 194-95, 530 N.E.2d at 1356; *Mitchell*, 163 Ill. App. 3d at 69, 516 N.E.2d at

507; *Johnson*, 150 Ill. App. 3d at 1085, 502 N.E.2d at 311.) It is the obligation of the party seeking review to make an adequate record at the trial level to preserve the issue for review. (*People v. Smith* (1969), 42 Ill. 2d 479, 483, 248 N.E.2d 68, 71.) Defendant has failed to meet his burden (*Johnson*, 150 Ill. App. 3d at 1084, 502 N.E.2d at 310) and is not entitled to a remand to the trial court for a *Batson* hearing.

We next address defendant's assertion that he was deprived of his right to a jury drawn from a representative cross-section of the community under the United States and Illinois Constitutions.

■■ The United States and Illinois Supreme Courts have specifically declined to extend the sixth amendment fair-cross-section requirement to petit juries. *Holland v. Illinois* (1990), 493 U.S. 474, 107 L. Ed. 2d 905, 110 S. Ct. 803; *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758; *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692; *People v. Holland* (1987), 121 Ill. 2d 136, 158, 520 N.E.2d 270, 279-80; *People v. Payne* (1983), 99 Ill. 2d 135, 138, 457 N.E.2d 1202, 1203-04, *cert. denied* (1984), 469 U.S. 1028, 83 L. Ed. 2d 372, 105 S. Ct. 447; *People v. Williams* (1983), 97 Ill. 2d 252, 278, 454 N.E.2d 220, 232-33, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364.

These cases have held that the sixth amendment requires only that a fair cross-section of the community be represented on venires, panels, or lists from which petit jurors are drawn. (See *Taylor*, 419 U.S. at 526, 42 L. Ed. 2d at 696, 95 S. Ct. at 696.) Thus, although the sixth amendment mandates that the jury pool be selected from a representative cross-section of the community, there is no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.

Defendant argues that the Illinois Constitution guarantees a right which is broader and more far-reaching than that conferred by the sixth amendment and relies upon *People ex rel. Daley v. Joyce* (1988), 126 Ill. 2d 209, 533 N.E.2d 873. Although such an argument may be made within the context of the defendant's ability to waive a jury trial, it cannot reasonably be argued that *Joyce* guarantees the right to a petit jury reflecting a representative cross-section of the community. The *Joyce* decision did not consider whether the exclusion of potential jurors on the basis of race violates a defendant's right to trial by jury under the Illinois Constitution.

■■ ■ While State constitutional provisions may, in certain circumstances, be given broader or more liberal constructions than those given similar Federal provisions, it is not necessary in all cases.

(*Joyce*, 126 Ill. 2d at 225-26, 533 N.E.2d at 880-81 (Clark, J., concurring).) The State Constitution need not be interpreted more broadly in every instance, and where the Federal precedents are persuasive, they may be followed. (*Joyce*, 126 Ill. 2d at 225-26, 533 N.E.2d at 880 (Clark, J., concurring).) We are persuaded by the decisions in *Holland, Taylor, Payne,* and *Williams* which interpret the sixth amendment. Consequently, we find that the Illinois Constitution does not require that petit juries reflect a representative cross-section of the community.

█ Defendant also contends that his murder conviction should be reversed because the jury instructions on murder and voluntary manslaughter erroneously set forth the State's burden of proof on the issue of self-defense. In support of this claim, defendant relies upon *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, which held that the giving of the Illinois Pattern Jury Instructions (IPI) on murder and voluntary manslaughter was "grave" error. The jury in the instant case received the IPI instructions on murder and voluntary manslaughter which were subsequently held invalid in *Reddick.*

Initially, we note that the Illinois Supreme Court recently held that the *Reddick* decision was not to be applied retroactively. (*People v. Flowers* (1990), 138 Ill. 2d 218.) This court has held, however, that *Flowers,* which involved a collateral attack of a conviction, was not controlling in cases which come before the court on direct review. (*People v. Riggins* (1990), 205 Ill. App. 3d 904, 912.) The case at bar is before us on direct review, and we will consider defendant's claims in accordance with the *Reddick* decision.

The error noted by the *Reddick* court exists where the voluntary manslaughter instruction in conjunction with the murder instruction fails to inform the jury that the State bears the burden of disproving the mitigating mental state necessary to reduce a murder charge to manslaughter. (*Riggins,* 205 Ill. App. 3d at 912; *People v. Fercsi,* (1989), 182 Ill. App. 3d 13, 15, 537 N.E.2d 912, 913.) Such a combination of instructions, if followed by a jury, eliminates the possibility of a defendant being convicted of voluntary manslaughter inasmuch as the only way a mitigating mental state can be proved is by the defendant, rather than by the State. *Riggins,* 205 Ill. App. 3d at 912; *Fercsi,* 182 Ill. App. 3d at 15, 537 N.E.2d at 913.

█ Yet, an erroneous instruction may be harmless if the result of the trial would have been the same had the proper instruction been given. (*Riggins,* 205 Ill. App. 3d at 912-13; *People v. Fierer* (1988), 124 Ill. 2d 176, 187, 529 N.E.2d 972, 976.) Consequently, a *Reddick* error can be harmless where a defendant has failed to present suffi-

cient evidence to justify the giving of an instruction on voluntary manslaughter. See *Riggins*, 205 Ill. App. 3d at 913; *People v. Daniel* (1989), 191 Ill. App. 3d 837, 548 N.E.2d 354; *People v. Thomas* (1989), 185 Ill. App. 3d 1050, 542 N.E.2d 100; *People v. Skipper* (1988), 177 Ill. App. 3d 684, 533 N.E.2d 44; *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531.

■ Considering the evidence here in light of the principles set forth above, it appears that the instruction error was harmless. The evidence established that defendant was armed with a gun in the alley and started shooting when he and his accomplices encountered three members of a rival street gang. There was no evidence that these three members of the rival gang were armed or had harmed or threatened defendant. The evidence does not indicate that defendant's life was in danger or that he acted in self-defense.

The only reference in the record indicating that defendant may have feared for his life was included in defendant's statement to the police where he stated that while in the alley, he heard someone shout "get them" and heard gunshots. Yet, there is no evidence in the record to indicate who said these words, who fired the gunshots, or that defendant's reaction was one of fear for his safety. It must be noted that several other members of defendant's gang were also in the area, which was dominated by the Latin Kings. It is, therefore possible that one of the Disciples had uttered these words and fired the gunshots heard by defendant. There is no evidence in the record establishing that the words and gunshots heard by defendant emanated from the three members of the Latin Kings in the alley.

Considering the totality of the evidence, it does not appear that defendant's life was in danger or that he acted in self-defense. Consequently, defendant failed to demonstrate the mitigating mental state for voluntary manslaughter which is necessary to shift to the State the burden of disproving this mental state. Thus, any error precipitated by the erroneous instructions was harmless beyond a reasonable doubt. *Riggins*, 205 Ill. App. 3d at 914; *Skipper*, 177 Ill. App. 3d 684, 533 N.E.2d 44; *People v. Carter*, 177 Ill. App. 3d 593, 532 N.E.2d 531.

We next address defendant's claim that he was deprived of the right to a fair trial by improper comments made by the prosecutor to the jury. Defendant asserts that the trial court erred in allowing the prosecutor to argue that only defense counsel's objections prevented the jury from hearing evidence of motive.

During closing argument, the prosecutor indicated twice that defense counsel's objections precluded the jury from hearing testimony

that defendant and his companions went out to hunt a Latin King.

██ Although it is improper for a prosecutor to comment on matters that are not in evidence or have been stricken or excluded during trial (*People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41) or to indicate to the jury that the defense is responsible for the exclusion of evidence favorable to the State's case (*People v. Lopez* (1980), 89 Ill. App. 3d 456, 411 N.E.2d 1071; *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402), improper comments are not reversible error unless they constitute a material factor in the defendant's conviction or result in substantial prejudice to the accused (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746; *People v. Satchell* (1981), 94 Ill. App. 3d 422, 418 N.E.2d 1063; *People v. Nodal* (1980), 89 Ill. App. 3d 538, 411 N.E.2d 1087).

██ In the instant case, the evidence established that defendant, armed with a gun, started shooting when he and his accomplices encountered three members of a rival street gang in an alley. There was no evidence that these three members of the rival gang were armed or had harmed or threatened defendant. At trial, a police officer and an assistant State's Attorney testified that defendant told them on August 9, 1985, he was with some of his friends in Hammond, Indiana, where they got involved with some Latin Kings. Defendant stated that the Latin Kings had gotten the better of them, and one of the members of the Disciples had been beaten up. Defendant stated further that he decided he wanted to get even with the Latin Kings and that the Disciples were out looking to get the Latin Kings.

Based upon this evidence, we find that the prosecutor's remarks did not result in substantial prejudice or constitute a material factor in defendant's conviction.

Finally, we consider defendant's contention that his sentences were excessive, an abuse of discretion, and based upon improper factors. Defendant asserts that the trial court relied on prejudice, failed to consider evidence in mitigation, and failed to sentence defendant as an individual.

██ In sentencing defendant to a 40-year term for murder and a concurrent 20-year term for attempted murder, the trial judge indicated that he had considered the presentence report, the testimony of the witnesses and the statements of counsel at the sentencing hearing, and the evidence presented at trial. Yet, the judge also referred to "the stupidity and slutliness of women," stated that people like the defendant were "slovenly" and "stupid," and referred to the "coward[ice]" of street gang members.

We believe these comments indicate that the sentencing judge did

not consider the requisite statutory factors and, therefore, failed to follow the mandate of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—4—1(a)). Consequently, defendant's sentences are vacated, and the cause is remanded to the trial court for resentencing.

For the foregoing reasons, defendant's convictions are affirmed, his sentences are vacated, and the cause is remanded to the trial court for resentencing.

Affirmed in part; vacated in part, and remanded.

McNAMARA and EGAN, JJ., concur.