THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM CHAMBERS, Defendant-Appellant.

First District (6th Division)   No. 1—91—1695

Opinion filed January 21, 1994.

74

Rita A. Fry, Public Defender, of Chicago (Paul D. Bellendir and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Eileen O'Neill, and Lou Ann Corey, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

After a jury trial, the defendant, William Chambers, was convicted of delivery of a controlled substance. The trial judge sentenced him to the Illinois Department of Corrections for 12 years. He maintains he was not proved guilty beyond a reasonable doubt; that his constitutional right to a speedy trial was violated; that several trial errors occurred that require a new trial; and that his sentence was excessive.

On April 3, 1990, Chicago police officer Israel Pacheco was working as an undercover officer purchasing narcotics. He would make as many as four purchases a day and sometimes return to the same area twice in one day. Between April 1990 and May 1991 he had made more than 100 drug purchases.

At approximately 7:45 p.m. on April 3, 1990, Pacheco and his two partners that evening, Therese Lykins and Daniel Bartoszewski, drove to the 1300 block of North Maplewood in Chicago. Pacheco was the "buy" officer and was driving a rental car. Lykins and Bartoszewski

were "surveillance" officers and followed him in an unmarked police department car.

Pacheco parked his car on the east side of the street in front of 1303 North Maplewood. He testified that although it was dark at 7:45 p.m., the corner was "well-lit" by artificial lighting; there was a light pole on the corner where Pacheco parked. As he was stopping at the curb, he noticed a black man and two young Hispanic men standing at the corner. The black man, who was wearing a black Los Angeles Raiders' T-shirt, a stonewashed black jean jacket and stonewashed black jeans, walked over to Pacheco's car. Pacheco made an in-court identification of the defendant as the black man. Pacheco had seen the defendant in the vicinity more than three times before.

As he walked toward Pacheco, the defendant asked, "What do you need?" Pacheco believed this question was an offer by the defendant to sell drugs. Pacheco told the defendant he "wanted two halves," which means a particular quantity of cocaine. The defendant told Pacheco he "had only sixteenths" of cocaine, which he would sell for $80. Pacheco said he would buy one "sixteenth," and the defendant removed a "small package of white powder" in a plastic bag from his pocket. At that time, the defendant leaned into Pacheco's car so that Pacheco and the defendant were face to face and only "a matter of inches" apart. The defendant gave Pacheco the bag of powder, and Pacheco handed the defendant $80. Pacheco did not arrest the defendant at the scene because he wanted to keep his identity secret in order to protect his safety and the integrity of the undercover police operation.

Pacheco drove away from the curb and watched the defendant in his rear-view mirror. He saw the defendant walk toward the Hispanic men. As Pacheco was driving, he used his radio to tell Lykins and Bartoszewski that he would meet them at a previously designated location. Pacheco drove to the meeting place, a fire station approximately four blocks from 1303 North Maplewood. Pacheco described the defendant to Lykins and Bartoszewski, who agreed that this was the individual they saw approach Pacheco's car. Lykins and Bartoszewski returned to North Maplewood to question the defendant. Approximately five minutes after they left, they called Pacheco on his radio and told him they had located and identified the defendant.

Lykins and Bartoszewski both testified that they were parked approximately three-fourths of a block behind Pacheco on North Maplewood. They were on the west side of the street, and he was parked on the east side. They testified that the lighting was good and that nothing obstructed their view of the defendant. They both saw the defendant with two Hispanic men on the corner of the 1300 block of

North Maplewood, and both saw the defendant walk away from the two Hispanic men and stand beside Pacheco's car. According to Bartoszewski, the defendant wore a black Raiders' sweatshirt with black stonewashed jeans and a black stonewashed jacket. Lykins testified that the defendant wore a black sweatshirt, a black denim jacket, and black jeans.

Lykins testified that the defendant leaned into Pacheco's car and the "upper portion [of his body] above the waist" entered the car. Bartoszewski saw the defendant "reach" into Pacheco's car with "the top portion of his body, his hands." They estimated that approximately two or three minutes passed from the time they drove to the corner until Pacheco drove away. Lykins looked at the defendant as she and Bartoszewski drove past him on the way to the fire station.

After the brief discussion with Pacheco at the fire station, Lykins and Bartoszewski returned to North Maplewood. They saw the defendant standing by himself approximately one block from the corner near 1356 North Maplewood. They left their car and questioned the defendant. Lykins testified that the interview lasted approximately five minutes. They did not arrest the defendant at this time because they wanted to protect Pacheco and maintain the undercover nature of the operation. The defendant showed Lykins and Bartoszewski a social security card, but did not present a photo ID. The officers later determined that the social security number on the card belonged to a William Chambers. The defendant also gave the officers his name, age, date of birth, height and weight. He told them his address was 3518 Evergreen.

Lykins completed a field contact card while they were interviewing the defendant and placed all this information on the card. Bartoszewski testified that the purpose of the field contact card is to help the officers when they complete later reports. The contact card was introduced into evidence. The blanks for date, signature, officer star number, beat number, and assignment were all blank on the contact card. When they returned to the police station, Bartoszewski placed all of the information from the contact card into his report. Bartoszewski additionally "ordered picture[s] of the subject"; the pictures arrived two or three days later. Both Lykins and Bartoszewski recognized the man in the pictures as the same man they saw beside Pacheco's car and later interviewed. They both identified the defendant as that man in court. The pictures of the defendant were introduced into evidence.

Funmi Mocha, a criminologist who worked as a supervisor in the Chicago police department's crime detection laboratory, testified that she tested the powder submitted by Officer Pacheco and determined that it was 1.64 grams of cocaine.

Janet Lockett, a "house mother" at 3518 Evergreen, testified for the defendant that the defendant had lived at 3518 Evergreen since December 1990, but did not live there in April 1990.

The defendant was 39 years old, divorced, and had two adult children. He attended Taft High School and received a license as a cook. He testified that in April 1990 he was living at 2746 West LeMoyne, where he received mail. He never owned a Raiders' shirt. He was not in the vicinity of North Maplewood on April 3, 1990, and did not "even go into that area." He had no recollection regarding what he was doing on April 3, 1990, but he knew that he did not sell drugs that day. He denied talking to Lykins and Bartoszewski and denied seeing any of the officers involved on April 3, 1990.

On cross-examination the defendant admitted that his date of birth, weight, height, eye and hair color and social security number are the same as the corresponding information written on the contact card.

In rebuttal the State introduced a certified copy of the defendant's conviction on May 22, 1978, for attempted murder and his sentence to a term of imprisonment.

We will first consider the defendant's claim that the judge erred in denying his pretrial motion to dismiss the indictment in which he claimed that his constitutional right to a speedy trial was violated because 283 days elapsed between the occurrence on April 3, 1990, and the date of his arrest on January 11, 1991.

Officer Pacheco testified before the Cook County grand jury on May 31, 1990. The grand jury voted a true bill. A warrant was issued for the defendant's arrest pursuant to the indictment on July 12, 1990. On January 12, 1991, the defendant was stopped by police officers who asked for his identification. After he showed them his identification, they ran a check and informed him that there was a warrant for his arrest.

The speedy trial provision of the sixth amendment does not apply to pre-indictment delay. (*United States v. Marion* (1971), 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455; *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.) Thus, while pre-indictment delay may be a violation of due process, it is not cognizable under the speedy trial clause. (*Marion*, 404 U.S. at 320, 322-23, 30 L. Ed. 2d at 478, 479-80, 92 S. Ct. at 463, 464-65.) The defendant repeatedly emphasizes that his only claim is based on a speedy trial violation and is not based on pre-indictment delay. In fact, he notes, "[i]n this case, the issue involved centers on a lengthy *postindictment* delay." (Emphasis in original.) Therefore, we should not consider the 283-day period between the drug sale and the date of the defendant's arrest; only the

time between the indictment and the arrest is relevant. Exactly six months passed between the date the defendant was indicted and the date he was arrested.

The Illinois case the defendant places primary reliance on is *People v. Jennings* (1973), 11 Ill. App. 3d 940, 298 N.E.2d 409. In *Jennings*, the defendant was a known member of the Students for a Democratic Society (SDS). He was arrested 258 days after a complaint and arrest warrant were filed against him; he was arrested for solicitation to commit mob action at the 1968 Democratic Convention. The *Jennings* defendant had no notice of the charges until his arrest. He was a full-time student at the University of Illinois during this 258-day period, and the arrest warrant indicated his student status. His driver's license and university records indicated that his permanent address was his sister's house in Cicero. He received mail and telephone calls at that address and contacted his sister frequently. Also, during the 258 days, he saw police officers while he was attending SDS activities, and one officer told the defendant he knew who he was and where he worked. The trial judge denied his motion to dismiss the complaint.

The appellate court reversed, holding that the delay under these circumstances was a violation of the defendant's right to a speedy trial. (*Jennings*, 11 Ill. App. 3d at 945.) The defendant claimed that his memory loss over the 258 days made it impossible to formulate a defense. The *Jennings* court stated that "[e]ight months could do much to erase the memory of a few minutes during an extremely tumultuous week." (11 Ill. App. 3d at 944.) This conclusion was supported by the fact that "there were substantial conflicts and discrepancies" in the State witnesses' testimony about the mob action. (*Jennings*, 11 Ill. App. 3d at 944.) Finally, the court noted the ease with which the defendant could have been arrested if the police had attempted to do so, and found that "the pre-arrest delay was caused by the State." *Jennings*, 11 Ill. App. 3d at 944.

The State relies primarily on *People v. Lawson*, which requires a defendant to show "actual and substantial" prejudice to prevail on claims that pretrial delay requires reversal. (*Lawson*, 67 Ill. 2d at 459.) As the defendant correctly notes, however, *Lawson* involved pre-indictment delay and discussed only due process and not the sixth amendment right to a speedy trial. (*Lawson*, 67 Ill. 2d at 457, 458-59.) Moreover, while the defendant does not recognize this point, several courts have held that "the *Lawson* standard is inapplicable" to cases involving "undue delay occurring after the filing of an indictment." (*People v. Belcher* (1989), 186 Ill. App. 3d 202, 205, 542 N.E.2d 419; see also *People v. Schroeder* (1981), 102 Ill. App. 3d 133,

429 N.E.2d 573; *People v. Dunn* (1977), 49 Ill. App. 3d 1002, 365 N.E.2d 164; see generally *People v. Nichols* (1978), 60 Ill. App. 3d 919, 377 N.E.2d 815.) Instead, the test for violation of speedy trial rights established in *Barker v. Wingo* (1972), 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182, and adopted by the Illinois Supreme Court in *People v. Bazzell* (1977), 68 Ill. 2d 177, 369 N.E.2d 48, applies to cases involving delay after indictment. *Belcher*, 186 Ill. App. 3d at 205.

In *Belcher*, the court explained application of the *Barker* test in Illinois. The test involves the analysis of four factors, which should be balanced and weighed by a trial judge: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. (*Belcher*, 186 Ill. App. 3d at 205.) The factors must be considered "in light of the circumstances of each case" and none of the factors is either a necessary or sufficient condition to the finding of a deprivation to the right of a speedy trial. (*Belcher*, 186 Ill. App. 3d at 207.) In cases where the defendant did not know about the charges against him, the third factor, assertion of the right, "is irrelevant." (*People v. Yaeger* (1980), 84 Ill. App. 3d 415, 419, 406 N.E.2d 555; *Belcher*, 186 Ill. App. 3d at 207.) Therefore, we need address only the three other factors.

The *Belcher* court explained that "the threshold question in a *Barker* analysis is whether the delay is presumptively prejudicial." (186 Ill. App. 3d at 205-06.) If there was an extremely long delay, a court may presume prejudice and shift to the State the burden of showing that the trial was timely. (*Jennings*, 11 Ill. App. 3d at 944.) In this case, a six-month delay is not presumptively prejudicial. This delay was shorter than other delays which did not raise any presumption, and was a great deal shorter than delays which were held presumptively prejudicial. *Belcher*, 186 Ill. App. 3d at 207 (presumption with 29-month delay); *Yaeger*, 84 Ill. App. 3d at 416-17 (presumption with 31-month delay); compare *Jennings*, 11 Ill. App. 3d at 944 (no presumption with 238-day delay).

■ Analyzing the three remaining factors, we judge that the trial court did not err in concluding that the six-month delay did not violate the defendant's sixth amendment right to a speedy trial. First, the delay was six months. Under the cases, this is a neutral factor. Second, the reason for the delay was explained by the State in this case, unlike many of the cases cited by the defendant, including *Jennings*. All three officers testified why the defendant was not arrested immediately—the need for secrecy and protection of identity in this undercover program. Moreover, while the defendant argues extensively that the State could have located him, the address on the arrest warrant was for 3518 Evergreen, where the defendant claims

he did not live until one month before his arrest, but was the address he gave the police. If he gave the police false information, the effect of that false information is attributable to the defendant, not the State. (See *Belcher*, 186 Ill. App. 3d at 206 (defendant need show that the delay was not attributable to his conduct).) Again, the facts presented by the defendant on this issue are not as strong as those present in *Jennings*.

The defendant points to the fact that he received unemployment compensation and a voter registration card at the LeMoyne address. In our judgment it would be unfair to impute to the three officers involved in this case the knowledge that some individual named William Chambers received a voter registration card at a particular address in the City of Chicago. Not only does the defendant ask us to impute that knowledge to those officers, but also to charge them with the responsibility of recognizing that the William Chambers at the LeMoyne address was, in fact, the same William Chambers who gave them the address of 3518 Evergreen.

The defendant argues that he was prejudiced by his loss of memory. However, the prejudice resulting from memory loss in this case is not as strong as that in *Jennings*, where the officers similarly suffered memory losses. Few, if any, cases do not have witnesses whose memories are not impaired by the passing of time to some degree. Balancing all of these factors, we cannot say that the trial judge abused his discretion in denying the defendant's motion to dismiss the indictment.

■ The defendant next maintains that the State violated the law of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, by using peremptory strikes against black venirepersons, Kevin James and Byron Gray. The defendant's entire claim of a *Batson* violation is based on the fact that the State dismissed the two black jurors, who, in the opinion of the defendant's attorney, "would have been exemplary jurors." We agree with the State that the defendant has not provided an adequate record on which this court may make a finding that the State violated *Batson*. The record does not show the number of peremptory strikes exercised by either side, the racial composition of the jury, the racial composition of the venire, the race of the venirepersons struck by either side or excused by the judge, or even the type of strike used against several dismissed venirepersons. In his brief, the defendant does not attempt to supplement or explain these gaps in the record, and he does not reply to the State's argument.

As the State notes, in *People v. Rosa* (1990), 206 Ill. App. 3d 1074, 565 N.E.2d 221, this court recently rejected a *Batson* claim under

similar circumstances. The *Rosa* defendant preserved the number of challenges used by each party and the race of the venirepersons struck but did not include in the record the racial composition of the venire or the seated jurors. The court explained that meaningful review of the claim was not possible "[b]ecause the record does not disclose the race of the seated jurors." (*Rosa*, 206 Ill. App. 3d at 1080.) The court noted, "[i]t is the obligation of the party seeking review to make an adequate record *** to preserve the issue for review" and concluded the defendant had not met this burden. (*Rosa*, 206 Ill. App. 3d at 1081.) Therefore, the court held that the record was insufficient to establish a *prima facie* case of discrimination and refused to grant the defendant a remand for a *Batson* hearing. We find the *Rosa* case controlling. The defendant has preserved even less detail about the jury selection for review than did the *Rosa* defendant. While it is true that the racially motivated removal of even one black venireperson violates *Batson* (*People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357), a *Batson* violation cannot be established merely by the numbers of black venirepersons struck by the State. (*People v. Lovelady* (1991), 221 Ill. App. 3d 829, 582 N.E.2d 1217.) We conclude that the defendant has not established the ground for a remand for a *Batson* hearing.

The defendant next contends that reversible error occurred when the trial judge refused to excuse venireperson Joseph Hayes for cause.

During the trial judge's questioning of Hayes at *voir dire*, the following occurred:

"JUDGE: Is there anything about the nature of this charge that you feel would affect your ability to give both sides a fair trial in this case?

A. I think only the fact that I feel kind of strongly about the issue in one of my kids is using drugs.

Q. Well, *** this is not a forum on how we feel about drugs. I would venture to guess most of the people, hopefully, if they came in this courtroom would feel strongly about drugs, against the use of drugs and certainly against selling them. But *** you would be in a position to make a determination based on the evidence and facts and testimony *** and follow the law as I give it to you to make a determination about whether or not the State had proved the defendant guilty beyond a reasonable doubt or not. Can you do that?

A. I guess I'm thinking I would have some concern about my objectivity.

Q. You feel you would be unable to listen to the evidence as presented and apply *** those facts to the law as I give it to you?

A. I think I could but I do have some concern.
* * *

Q. Is there anything in your background we have not touched upon that would affect your ability to give both sides a fair trial in this case?

A. Just what we talked about."

The defendant's attorney argued that Hayes "should be stricken for cause," because Hayes' reservations about his own objectivity showed that he could not be a fair juror. The judge rejected this argument, explaining: "When I asked him whether or not he could *** apply the facts to the law as I give it to him, he said he could do that." The judge then denied a motion to dismiss Hayes for cause, and the defendant excused him by use of a peremptory challenge.

■ We believe our ruling is controlled by *People v. Delgado* (1992), 231 Ill. App. 3d 117, 596 N.E.2d 149, in which the trial judge refused to strike a venireman for cause in a case involving a drug offense. The venireman explained that a friend of his had died from a drug overdose, and that "sometimes [he] wonder[ed] if [he] could be impartial" in a drug case. (*Delgado*, 231 Ill. App. 3d at 120.) He "would try [his] best" to be impartial and "believe[d] he could" but "just d[id]n't know." (*Delgado*, 231 Ill. App. 3d at 120.) The defense used a peremptory challenge to exclude that venireman from the jury and argued on appeal that the judge should have excused him for cause. The appellate court rejected this argument, explaining: "[The] defendant has failed to allege that he exhausted his peremptory challenges when he excused [the venireman], and that an objectionable juror was forced upon him after he exhausted his peremptory challenges." (*Delgado*, 231 Ill. App. 3d at 121.) In so holding the court relied on *People v. Green* (1990), 199 Ill. App. 3d 927, 557 N.E.2d 939, and *People v. Washington* (1982), 104 Ill. App. 3d 386, 432 N.E.2d 1020. The court refused to follow the case cited by the defendant here, *People v. Johnson* (1991), 215 Ill. App. 3d 713, 575 N.E.2d 1247. The *Delgado* court's refusal to follow *Johnson* is significant because the same panel that decided *Delgado* had decided *Johnson*. We judge that the defendant has failed to establish that his use of a peremptory challenge to reject Hayes forced him to accept an objectionable venireman because all his peremptory challenges had been exhausted.

The defendant's final contention regarding jury selection is that the judge erred by not allowing him to question two venirepersons in depth about their associations with police officers. During *voir dire*, the examination of venirepersons Cheryl Van Arkel and Debra Nottleman disclosed that they had close relationships to attorneys and police officers. The defense attorney's request to question the women in depth about their associations with police was denied by the trial

judge, and they were subsequently excused, apparently through use of peremptory challenges by the defense.

Van Arkel explained that she had a close friend who was a Chicago police officer, she knew another officer, she knew several assistant State's Attorneys, and she knew other attorneys. She had not discussed any cases with her police officer friend "recently." She said that she would be able to set aside anything she might have learned from talking to her police officer friend and could follow the law as the judge gave it to her. There was nothing that she thought would affect her ability to give both sides a fair trial.

Nottleman's father was a police officer in a gang crimes unit, and her brother-in-law was an attorney. She said that neither relationship would affect her ability to give both sides a fair trial. She also said she would not give undue weight to testimony by police officers. The defense attorney argued that he should be allowed to ask Van Arkel and Nottleman specific questions about discussions they had with police officers, and the judge denied this request. Again, we believe no error occurred in the judge's ruling limiting the examination of Van Arkel and Nottleman.

In *People v. Salazar* (1991), 211 Ill. App. 3d 899, 570 N.E.2d 802, the defendant requested that the judge ask all prospective jurors several specific questions involving drugs and relationships with police. The trial judge refused to ask the questions proffered. On appeal the defendant claimed he was denied a fair trial by the judge's actions. The appellate court rejected this argument because the "defendant [did] not argue that the jury finally selected was actually unfair or biased in any manner." (211 Ill. App. 3d at 909.) The court refused to infer prejudicial error under these circumstances.

■ Similarly, the defendant does not argue that the seated jurors were unfair to him or biased against him. Most important is the fact that Van Arkel and Nottleman did not sit on the jury. Even if we chose to analyze the propriety of the judge's decision that the jurors did not need to be questioned further, we would hold that the judge did not abuse his discretion. In *People v. Morgan* (1987), 152 Ill. App. 3d 97, 504 N.E.2d 172, the court held that very similar circumstances did not constitute error.

The defendant next contends that reversible error occurred when State witnesses were permitted to testify concerning materials which were not tendered to the defense in violation of pretrial discovery orders.

After jury selection, but before opening statements, the prosecutor told the judge and the defendant's attorney that that morning he became aware that the police had obtained a "CB photograph of the

defendant." He said he did not intend to have the photograph go back to the jury. He also told the judge that the officers would not testify that the photograph was "a CB or mug shot photograph." The prosecutor also informed the judge that he had also received a contact card from the police and had given it to the defendant's attorney. The defendant's attorney objected to the use of the photograph, but he did not object to the use of the contact card. The judge refused the defendant's attorney's motion to exclude the photograph.

Police testimony established that the officers received photographs of the defendant two or three days after April 3, 1990. The photographs were introduced into evidence but were not shown to the jury. Lykins testified that she completed a field contact card while she was interviewing the defendant. The purpose of a field contact card is to help the officers when they complete later reports. Bartoszewski placed all the information from the contact card into his report. The report was given to the defendant before trial. We are unable to determine whether it was introduced into evidence. No claim is made that it was given to the jury.

During the cross-examination of Pacheco, the defendant's attorney asked him what denominations the bills were that he gave the defendant. Pacheco answered that he could not remember. The defendant's attorney then asked whether he inventoried the money used, and Pacheco answered that he inventoried photocopies of the money. When the defendant's attorney asked if the photocopies of the money used were in his report, Pacheco answered that they "should be." The defendant's attorney then asked for a side bar and argued that he was never made aware of photocopies of the money; the assistant State's Attorney answered that the prosecutors also were unaware that photocopies of the money existed. The judge then denied the defense attorney's motion to strike any reference to "any transfer of money whatsoever."

Lykins testified on direct examination without objection that she recorded her conversation with the defendant on the field contact card. The defendant's attorney *marked the field contact card as a defense exhibit* and cross-examined Lykins about the things that were missing from the card, such as a signature, police star number, date and time. Bartoszewski also testified on direct examination to the contact card and was cross-examined by the defendant's attorney about the absence of certain matters from the card.

■ It was not until the defendant's attorney filed his post-trial motion that he first raised any specific objection to the failure to provide him with the contact card in a timely fashion. In this court, he raises for the first time the argument that the contact card

contained a summary of a conversation that the police had with the defendant. In our judgment, the defendant has waived any objection to the use of the contact card by his failure to make a timely objection. Moreover, his claim that he was not provided with the contents of the defendant's conversation with Officers Lykins and Bartoszewski is contrary to the record. The police report, which was provided to the defendant, incorporated the conversation that the police officers had with the defendant and contained the same information that was on the contact card.

We further find that the defendant has waived any argument concerning the failure of the assistant State's Attorney to provide him with photocopies of the money that had been used. He did not raise any point about the photocopies in his post-trial motion. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) In addition, the photocopies of the money would not have assisted either the State or the defense. The defendant never denied that a sale took place or that the police officers used $80 in the transaction.

We also find that no reversible error occurred because of the failure to provide the defendant with notice of the photographs of the defendant. Under Illinois Supreme Court Rule 412 (134 Ill. 2d R. 412(a)(v)) the State must tender, upon proper defense discovery requests, any photographs the State intends to use at trial. This rule is mandatory, and compliance is only excused when the State, exercising due diligence, could not have learned of the information before trial. (*People v. Patterson* (1981), 102 Ill. App. 3d 844, 430 N.E.2d 574.) The State's failure to comply with the discovery requirements, however, does not in all instances necessitate a new trial. A new trial is required only if there was prejudice to the defendant. Among the factors to be considered in determining whether a new trial is required because of a discovery violation are the closeness in the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice could have helped discredit the undisclosed evidence. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.) The defendant has the burden of showing how he was prejudiced and must explain how earlier disclosure "would have altered [his] trial strategy and possibly changed the outcome of the case." *Cisewski*, 118 Ill. 2d at 173.

The defendant has not made any attempt to show how the late disclosure of the photographs prejudiced him. His attorney was aware of the photographs when he made his opening statement, in which he maintained that the defense was mistaken identity. That was still the defense throughout the trial, including closing argument. The defendant's attorney never asked for a continuance (see *Cisewski*,

118 Ill. 2d at 175), and he has not shown how previous knowledge of the photographs could have helped him discredit the photographs. For all these reasons we conclude that the defendant has failed to show grounds for a new trial on the basis of violations of discovery orders.

The defendant makes a separate argument that the introduction of the photographs was prejudicial error because they amounted to proof that the defendant had committed another crime. The two photographs are together on one sheet. One shows a frontal view of the defendant, and the other shows a side view. The front view shows a plate suspended from the neck of the defendant with what appears to be an identification number and the date, "March 19, 1977." It is obvious that these are police photographs.

The State did not disclose the source of the photographs in the direct examination. During the cross-examination of Pacheco the following occurred:

"Q. Now you said two or three days later you ordered pictures, correct?

A. Correct.

Q. Those pictures weren't—those pictures where not taken of Mr. Chambers on April 3, correct?

A. No, they weren't.

Q. Those pictures weren't even taken on—in 1990, correct?

A. I don't know when they were taken.

Q. None of your fellow officers ever took those pictures, correct?

A. Correct.

Q. Those aren't pictures of him on the street, are they?

A. It is an arrest picture."

In *People v. Arman* (1989), 131 Ill. 2d 115, 545 N.E.2d 658, the defendant argued that he had been misidentified. A police detective testified that he learned a possible name for the defendant, and then called law enforcement agencies to obtain a photograph of the named person. He recognized the person in the photograph he obtained as the person he had seen and knew as the defendant. The State was permitted to show the photograph to the detective, but the defense objection to the detective's characterization of the photograph as a "Chicago police department identification" was sustained. *Arman*, 131 Ill. 2d at 120.

On appeal, the defendant claimed the statement improperly referred to other crimes evidence and caused reversible error. The supreme court held that when identification is a material issue, testimony relating to the use of photographs in an investigation may be introduced to show how a defendant was initially linked to the

commission of an offense. The court cautioned that the admissibility of such evidence is not without limits and that photographs used to inform the jury of a defendant's commission of other, unrelated criminal acts should not be admitted. The court held that the detective properly testified about requesting a photograph but his reference to the photograph as a police identification photograph was error. Nonetheless, the *Arman* court explained that such error is not grounds for reversal "[w]hen the competent evidence of the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial without the erroneous admission of the challenged evidence would produce no different result." *Arman*, 131 Ill. 2d at 124.

■ We judge that, under *Arman*, the introduction of the photographs was proper and that the officer's testimony did not prejudice the defendant. The jury subsequently learned that the defendant had been convicted in 1978 of attempted murder. Consequently, they knew that the defendant had been previously arrested. The only reasonable inference would be that the arrest the officer referred to was the arrest for the crime for which the defendant was convicted in 1978. While we cannot say that the evidence in this case is overwhelming, we can say that it was a strong case for the prosecution. We therefore conclude that no reversible error occurred regarding the admission of the photographs and the testimony of Pacheco.

■ The defendant next argues that his right to present a defense was prejudicially restricted by the trial judge. Specifically, he contends that the judge prevented him from establishing that he was a hard-working cook who was doing his best to support his children, that until January 11, 1991, he had no knowledge that he been charged with a crime which occurred on April 3, 1990, and that he had lost his social security card in March 1990. We do not agree that the judge abused his discretion in denying the defendant's evidence of his personal traits, but we do agree that the judge improperly sustained objections by the assistant State's Attorney to other evidence offered by the defendant.

In his opening statement, the defendant's attorney told the jury that the defendant lost his identification some time before April 1990, which included "a photo identification he used for public aid purposes" and a social security card. He pointed out that "those materials could have been taken by anybody else" and shown to the officers by someone other than the defendant. He also told the jury that they would wonder how "anyone could prepare a defense under these conditions." He asked rhetorically, "How can we remember back that far [nine months before]?" He said, "Obviously, [the defendant] can't remember that." No objection was made by the State to

these statements by the defendant's attorney. But when the defendant's attorney asked the defendant about the loss of his identification in March 1990 and the fact that he was arrested in January 1991, the prosecutor made repeated objections, without explanation, and the objections were sustained. The defendant was finally permitted to testify, over a State objection, that he did not have a social security card on April 3, 1990, because he had lost it in March 1990.

The prosecutor brought out on cross-examination the fact that the defendant did not have "any recollection of where he was" on April 3, 1990.

On redirect examination the following occurred:

"Q. You testified—you told the State's Attorney that you can't remember what you did on April 3, right?

A. That's right.

Q. Because you weren't even notified this charge was against you until January of 1991, correct?

STATE'S ATTORNEY: Objection.

JUDGE: Sustained."

During the defendant's attorney's closing argument, the following occurred:

"DEFENSE ATTORNEY: How many people remember what they were doing eight months ago? How many people can say what were you doing on April 3, and I ask the question on January 11, can you answer that question. What were doing on 7:45 on that particular day. Mr. Chambers came into court here to testify honestly. Hey, I don't remember.

STATE'S ATTORNEY: Objection, your Honor.

JUDGE: Sustained. It is for the jury to decide.

* * *

DEFENSE ATTORNEY: Did they arrest him right afterwards, we heard that, we heard that from the State even about how they don't arrest them because they want to blow the cover. So you don't arrest him the next day, you don't arrest him the next day, you just keep letting it go, months go by.

STATE'S ATTORNEY: Objection, your Honor.

JUDGE: Sustained."

We do not understand why the prosecutor made the objections that he did, particularly in view of the defense's opening statement, and we do not understand why the objections were not overruled. The jury should have been permitted to weigh the testimony that the defendant lost his social security card regardless of how weak *we* might believe that testimony was, and the jury should have been permitted to consider the effect of the lapse in time in weighing the

defendant's inability to remember where he was in April 3, 1990. But we do not believe the restrictions on the defendant's testimony were prejudicial. A reviewing court looks not only to what the defendant was prohibited from doing, but to what the defendant was permitted to do. (*People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 550 N.E.2d 1011.) The defendant was finally able to testify that he had lost his social security card in March 1990, and the defendant's attorney was able to get his point across that the defendant was not arrested until January 11, 1991. Under the circumstances, we conclude that the limits on the defendant's examination did not result in manifest prejudice to him.

The defendant next maintains that he was improperly restricted in the cross-examination of the police officers. He intended to cross-examine the officers about the types of buildings in the 1300 block of North Maplewood and what the Hispanic men on the corner looked like. The judge sustained the State's objections.

■ We have considered the cross-examination of the officers and conclude that, although we might have ruled differently on the State's objections, the restrictions on the cross-examination could not have had any effect on the jury verdict. The defendant's attorney was clearly able to question all three officers about their ability to recall the crime scene. He asked all three officers about the types of buildings on the street and the type of material used on the buildings. He asked all three officers about their position on the street, and all three testified about the lighting. Pacheco and Lykins were both cross-examined about the others who were on the corner; about the presence of the two Hispanic men and where they were standing; and about the number of undercover drug purchases they had observed, thus enabling the jury to evaluate the chance to confuse this incident with a different drug sale. Considering the questions the defendant's attorney was permitted to ask, the jury had sufficient evidence to assess the ability of Pacheco and Lykins to recall the crime scene.

■ The defendant also maintains that the trial judge erred by giving an instruction on circumstantial evidence (Illinois Pattern Jury Instructions, Criminal, No. 3.02 (2d ed. 1981)). The defendant's attorney initially agreed to the instruction, then changed his mind, arguing that there was no admissible circumstantial evidence. The judge overruled his objection and gave the instruction. We disagree with the defendant that there was no circumstantial evidence. Indeed, the circumstantial evidence was extremely strong. The police officers arrested an individual who gave the officers information, including a birth date and social security number which were the

defendant's birth date and the defendant's social security number. The individual also had the same physical characteristics that the defendant did. Most significantly, in April 1990, the individual gave his address as 3518 Evergreen. We understate when we say that it is a circumstance damaging to the defendant that 3518 Evergreen was, in fact, the defendant's admitted address in December 1990. For these reasons, we conclude that no error occurred in the giving of a circumstantial evidence instruction.

■ The defendant next claims that the trial judge denied him a fair trial by making many comments that indicated his hostility toward the defendant and his attorney. The State concedes that "there can be no doubt that the trial judge in this case displayed a limited amount of impatience." We have reviewed the entire record, and we agree that the record discloses that the judge could have been more patient with the defendant's attorney and that some of his remarks would have been better left unsaid. The worst of those remarks occurred during closing argument when the judge sustained a State objection and told the defendant's attorney: "[Y]ou know better than that and if you don't know better you should know better." But we do not believe the judge's remarks prejudiced the defendant or his attorney in the eyes of the jury. The remarks of the judge in this case were far less personal than were the remarks made in *People v. Williams* (1991), 209 Ill. App. 3d 709, 568 N.E.2d 388, in which the appellate court affirmed a conviction despite what were deemed to be improper personal remarks directed to the defendant's attorney. In *Williams*, for example, the trial judge told the defendant's attorney in the presence of the jury that his conduct was "unprofessional." *Williams*, 209 Ill. App. 3d at 719-20.

In the case cited by the defendant, *People v. Pressley* (1987), 160 Ill. App. 3d 858, 513 N.E.2d 921, the appellate court reversed a conviction because of several remarks by the trial judge. In one of the exchanges, the trial judge sustained an objection by the State and told the defendant's attorney: "If you would listen to what your witness is saying you wouldn't have to put him in a box. *You are worse than he is.*" (Emphasis added.) (*Pressley*, 160 Ill. App. 3d at 865.) In reversing, the appellate court implicitly held that the case was a "close case." (*Pressley*, 160 Ill. App. 3d at 865.) The case before us is not a close case.

■ The defendant also maintains that the evidence was insufficient to establish his guilt beyond a reasonable doubt. We disagree. For the reasons we have already expressed, in which we noted that this was a strong case for the prosecution, we necessarily conclude that the defendant's guilt was established beyond a reasonable doubt.

Three separate witnesses identified him, and their identification was corroborated mightily by the circumstantial evidence we have already described.

■ The defendant next maintains that his 1978 conviction should not have been admitted because it was remote in time and character to the delivery of a controlled substance. A judge's decision to admit evidence of a previous conviction should not be reversed by a reviewing court absent an abuse of discretion. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) The defendant has not shown us any reason for us to conclude that the judge abused his discretion in this case.

The defendant also urges this court to follow the special concurring opinion in *People v. Kunze* (1990), 193 Ill. App. 3d 708, 550 N.E.2d 284, which suggested that a rule be adopted which would permit a trial judge to limit the proof of previous convictions to the fact that a defendant (or witness) had previously been convicted of a felony without informing the jury of the nature of the felony. (*Kunze,* 193 Ill. App. 3d at 728-36 (Steigmann, J., specially concurring).) The special concurrence explicitly recognized that it was a suggested position only, which would have to be adopted by the supreme court. (*Kunze,* 193 Ill. App. 3d at 728.) We note that the suggestion in the special concurring opinion of *Kunze* has been rejected by the Second District Appellate Court in *People v. Thomas* (1991), 220 Ill. App. 3d 110, 580 N.E.2d 1353. We adhere to the views expressed in *Thomas.*

The defendant's last claim is that the trial judge abused his discretion in sentencing him to a term of imprisonment of 12 years. The defendant was eligible for a sentence from 4 to 15 years. At the sentencing hearing, it was established that the defendant had been sentenced to probation in 1972 for battery and in 1974 for unauthorized use of a weapon. In addition, he had been convicted of attempted murder in 1978 and had been paroled in 1982.

A reviewing court should reduce a sentence only when a trial judge abuses his sentencing discretion. (*People v. Salazar* (1991), 211 Ill. App. 3d 899, 570 N.E.2d 802.) When the sentenced imposed is within the statutory limits, a rebuttable presumption arises that the sentence imposed was proper and is only overcome by an affirmative showing that the sentence imposed varies greatly from the purposes and spirit of the law. (*Salazar,* 211 Ill. App. 3d at 913.) While the trial judge should consider rehabilitation as a factor when sentencing, he is not required to list for the record every reason for a particular sentence, nor is he required to assign a value to each fact presented as evidence at the sentencing hearing. *People v. Curtiss* (1984), 126 Ill. App. 3d 568, 467 N.E.2d 624.

█ The defendant was able to present evidence in mitigation but was faced with the fact that he had three previous convictions. Although it had been some time since the defendant's conviction in 1978 and his release in 1982, the judge was correct when he noted the defendant's criminal record. He did not have to place any particular value on the defendant's testimony in mitigation. We cannot say that the judge abused his discretion when sentencing the defendant.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.